**In re James Ralph LILYERD and Christel Bridgett Lilyerd, Debtors.**

**Bankruptcy No. 5–85–3.**

United States Bankruptcy Court,
D. Minnesota,
Fifth Division.

March 14, 1985.

Neil R. Tangen, Hoffman, Minn., for debtors.

James L. Wiant, St. Cloud, Minn., for Production Credit Ass'n of St. Cloud.

## OPINION

GREGORY F. KISHEL, Bankruptcy Judge.

The above-captioned matter came on before the undersigned United States Bankruptcy Judge for trial on February 1 and 6, 1985, upon the motion of the Production Credit Association of St. Cloud (hereinafter "PCA"), a secured creditor, for relief from the automatic stay imposed by 11 U.S.C. § 362. On February 28, 1985, a hearing was held upon Debtor's motion for use of cash collateral under 11 U.S.C. § 363 and on Debtors' attorney's application for allowance of attorney fees.[1] PCA appeared by its attorney, James L. Wiant. Debtors appeared personally and by their attorney, Neil R. Tangen. John A. Hedback, attorney to the U.S. Trustee, appeared at the cash collateral and attorney fee hearing. Upon the evidence adduced at the trial and the hearing, the arguments and memoranda submitted by counsel, and all of the other files, records, and proceedings herein, the Court determines that PCA's motion for relief from stay must be granted, and that Debtor's motion for use of cash collateral must be denied.

---

1. At the hearing, Debtor's attorney withdrew his application for allowance of fees.

## FINDINGS OF FACT

1. That Debtors filed their Voluntary Petition for Relief under Chapter 11 of the Bankruptcy Code in this Court on January 4, 1985.

2. That Debtors are the majority shareholders in Big Meadow Ranch, Inc. (hereinafter "Big Meadow"), a Minnesota corporation which filed its Petition under Chapter 11 of the Bankruptcy Code in this Court on January 18, 1985.

3. That Big Meadow holds the fee title to approximately 3,536 acres of real estate in Kanabec County, Minnesota, which is presently occupied by Debtors and their family. Debtors and their family raise beef cattle on a portion of this real estate. They are also in the early stages of subdividing and developing approximately 300 acres of it for resale as recreational lots under the trade name of "Eagle Ridge Recreation Development". Debtors are in the early stages of road construction and to date have done virtually all of the physical work of development themselves. As of February 6, 1985, the completed roads in the development did not meet local zoning requirements for recreational subdivision; in addition, Debtors apparently had not begun site preparation on individual lots. No plat has been filed for the subdivision and no sales of the lots have been consummated to date.

4. That Debtor J. Ralph Lilyerd, Jr., is customarily employed on a seasonal basis as a welder in the pipeline construction trades; in addition, Debtors have derived income over the past several years from the cutting and sale of wood on their real estate. Debtors' income from construction employment and wood sales has provided them with their sole source of family support and they have realized no income for family support from land development or beef cattle farming for at least four years prior to the date of filing of their Petition. Debtors are not presently cutting wood and do not plan to resume this activity.

5. That, as of November 19, 1984, Debtors and Big Meadow owed PCA the sum of $706,036.95 in principal and interest accrued through to that date. Interest has continued to accrue against the principal sum in the amount of approximately $221.00 per day.

6. That Debtors' and Big Meadow's obligations to PCA are secured by two mortgages against the real estate owned by Big Meadow. Both of these mortgages have been perfected by filing in the office of the Kanabec County Recorder. In addition, the real estate held by Big Meadow is encumbered to several other mortgagees. A summary of all encumbrances against the Big Meadow real estate as of February 6, 1985, is as follows:

| Mortgagee | Approximate Balance (2/6/85)[2] | Daily Interest Accrual |
|---|---|---|
| Travelers Insurance Co. | $79,500.00 | $21.75 |
| PCA | $123,000.00 | See Finding of Fact 5 |
| Farmers Home Administration[3] | $155,560.00 | $28.81 |
| Kanabec State Bank[3] | $52,335.00 (Due in full, 9/1/84) | $17.42 |
| PCA | $377,000.00 | See Finding of Fact 5 |
| Total | $787,392.00 | $288.98 |

2. PCA did not place the actual balances of these encumbrances into evidence and some of the stated balances may be the original principal amounts of the loans. The actual balances may be greater than those indicated, due to accrued interest. This possibility does not change the Court's conclusion on the ultimate issues herein.

3. There is some dispute as to the relative priority of the Farmers Home Administration and Kanabec State Bank mortgages, but apparently this uncertainty is only as between these two encumbrances; it does not affect the relative priority of PCA's mortgages.

In addition, Big Meadow owes approximately $18,000.00 in back real estate taxes on the real estate, and ASCS holds a first lien against the silo installed as a fixture on the real estate to secure an obligation in an outstanding principal balance of approximately $14,000.00. The back real estate taxes are a priority lien against the real estate under Minnesota state law.

7. That PCA has a duly perfected security interest against all of Debtors' following property:

All livestock and the young of all livestock, all farm machinery & equipment & all accessions to including spare & repair parts, special tools & equipment for such farm machinery & all milk, all lease, contracts, contract rights & accounts receivable (recorded or unrecorded) arising from the sale, lease & disposition of farm products, personal property & other property of a similar nature, all supplies, all livestock feed and grain, and all crops. 1972 Hein Werner C12 crawler backhoe.

There is no evidence of record that any of Debtors' livestock, crops or equipment is cross-collateralized.

8. That, as of January 28, 1985, the fair market value of the Big Meadow Ranch real estate was $640,000.00.

9. That, as of February 6, 1985, the value of Debtors' cattle herd, consisting of 570 head, more or less, was approximately $120,000.00.

10. That, as of February 6, 1985, the net liquidation value of Debtors' farm equipment was approximately $50,000.00.

11. That values for agricultural and undeveloped land in Kanabec County have declined by approximately 10% per year since 1981. It is expected that land values in Kanabec County will continue to decline at the same rate for the foreseeable future, due to the depressed agricultural market and the current crisis in farm finance.

12. That, on or about February 14, 1985, Debtor J. Ralph Lilyerd, Jr., sold approximately 196 head of mixed-age cattle from his herd at market in Sioux City, South Dakota. Included in the cattle sold were all but 50 of Debtors' 1984 calf crop, which in the normal course Debtors would have kept until fall, 1985, for further fattening before sale. Debtors give no reason for making this off-season sale other than that they needed the sale proceeds immediately to purchase feed, labor, and supplies for the maintenance of the remainder of their herd. Debtors realized net sale proceeds from this sale of $54,005.95. Debtor's counsel presently holds these proceeds in the form of a check made payable to J. Ralph Lilyerd, Jr., and PCA jointly. This sale was made without advance notice to PCA and without obtaining prior authorization from PCA or the Court.

13. That, on May 3, 1983, Debtors gave a financial statement to PCA stating that they held 1,198 head of cattle (consisting of beef cows, bred heifers, bulls, heifers, steers, and spring 1983 calves) as of that date, of a total value of $446,300.00.

14. That Debtors' financial statement of May 3, 1983, overstated the number and value of cattle which they then held. There is no evidence of record from which the Court can determine the number by which it overstated the size of the herd, as Debtors have never kept an accurate count of their herd. Further, Debtors acquiesced in the practice of PCA's former loan officer to estimate the size of their herd and yearly calf crops at the high end of Debtor's verbal estimate rather than at the low end, during the preparation of financial statements over the course of several prior years. This resulted in a distortion of the stated size of their herd of some unknown magnitude.

15. That the size of Debtor's herd has decreased by an unknown number since the financial statement of May 3, 1983, through death due to adverse weather;

weakness or death from insufficient nutrition; theft; accidental or deliberate killing by vandals or deer hunters; predation; and other causes unknown to Debtors and PCA. Because Debtors have failed to accurately monitor the size of their herd on an ongoing basis, at this point the Court and the parties cannot determine the numbers so lost.

16. That Debtors sold the following numbers of cattle since the financial statement of May 3, 1983:

| | |
|---|---|
| 78–80 head | March, 1983 |
| 105 head | August, 1984 |

in addition to the sale made on or about February 14, 1985. Debtors turned the full proceeds of these sales over to PCA. The application of these proceeds to Debtors' debt to PCA has not even been sufficient to keep current on interest accruing during this period.

17. That, since December, 1984, Debtors have fed their herd a substance variously termed "potato by-products" by Debtors, and "potato slop" by PCA. This substance consists of a watery mix of potato peels and the portion of the nutritious part of a potato remaining after commercial processing of the potato for human consumption, together with a large portion of water. It is available to Debtors at relatively low cost from potato processing plants in the Twin Cities area, and they have made arrangements to transport it from the supplier to their farm. Debtors have fed this substance to their herd on a regular basis only since late January, 1985.

18. That Debtors are presently feeding their cattle a ration of the potato product above-described and hay which they have cut and stored themselves. The late-season hay which they are feeding their cattle is of marginal protein content. Debtors' veterinarian, Lawrence C. Kaiser, D.V.M., concluded that this combination is "adequate feed" for beef cattle from the standpoint of both energy and protein, though his conclusion was not based upon any assessment of the protein content of the hay which Debtors are actually feeding their cattle and he did not voice any opinion as to the ideal feeding regimen for optimum weight gain in beef cattle.

19. That, during inspections of Debtors' herd on January 19, 21, and 30, 1985, Dr. Kaiser found that Debtors' 1984 calf crop was "skinnier than [he] expected them to be", and that a large percentage of the adult cows were "skinnier than they should be at that time [of year]". Dr. Kaiser concluded that the heifers in Debtors' herd were "generally in better body condition than the cows", and of "fairly good body condition". However, a substantial number of the heifers are underweight and will be less mature than desirable by the spring 1985 breeding season. This will both delay breeding and sale of these cattle and increase the difficulty of conception and birth in the 1985 calf crop.

20. That, due to the fact that Debtors did not maintain heated watering or feeding facilities for their herd, Debtors' herd apparently has not obtained an adequate volume of either water or the potato product during the months of December, 1983, through February, 1984. During the cold weather, the potato product has frozen in the open troughs from which Debtors feed the herd, before it is completely consumed. Debtors have relied upon a small hole dropped in the ice of a creek for the herd's winter water source, which is insufficient for a herd of this size.

21. Though the herd may fatten up to some degree on pasture during the summer months of 1985, the lack of adequate feed over the winter of 1984–85 and until the 1985 pasture comes in will continue to decrease the value of the herd, by causing lower weights and smaller size and by increasing the likelihood of calf or heifer birth mortality.

22. That Debtors have no enclosed storage facility for their farm and earth-moving equipment. They store it outside on scattered sites on the Big Meadow real estate. Exposure to the cold and elements has caused excessive damage to the equipment and has depreciated its value at a rate greater than normal. PCA acquiesced in this practice until Debtors filed their Petition herein.

23. That Debtors and Big Meadow have made no offer of adequate protection to PCA during the pendency of this case or the Big Meadow case, whether in the form of a replacement lien or periodic payments. Debtors have no unencumbered nonexempt property or equity in property to which a replacement lien could attach.

24. That Debtors have moved for an Order authorizing them to use $10,000.00 of the cattle sale proceeds described in Finding of Fact 12 for expenses which they expect to incur through September 1, 1985, in their beef cattle operation. Debtors have no other source of capital to fund their cattle operation for this period. Debtors have made no accurate projection as to the amount of these expenses but Debtor Ralph J. Lilyerd, Jr. estimated the anticipated expenses as follows:

| | |
|---|---|
| Feed (potato slop) | $2,000.00 |
| Feed (hay harvest expense) | 3,000.00 |
| Labor | 1,500.00 |
| Trucking and hauling | 2,500.00 |
| General maintenance and emergency expenses | 1,000.00 |
| Total | $10,000.00 |

25. That, over the four years preceding their bankruptcy filing, Debtors accumulated substantial unsecured debts to trade suppliers for their beef cattle operation, and were not able to generate cash flow sufficient to prevent these accounts from going into arrears. Debtors' Schedules list a total of $94,608.70 in unsecured debt, the great majority of which appears to be for utilities, fuel, parts, and supplies furnished for Debtors' cattle operations and land development activity.

## CONCLUSIONS OF LAW

### I. Relief from Stay Issues

PCA has moved for relief from stay pursuant to 11 U.S.C. § 362(d). That statute provides in pertinent part as follows:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

(2) with respect to a stay of an act against property, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

On any motion for relief from stay under § 362(d), the moving party has the burden of proof on the issue of the debtor's equity in any property involved and the party opposing the motion has the burden of proof on all other issues. 11 U.S.C. § 362(g).

PCA argues that it is entitled to relief from stay under both § 362(d)(1) and § 362(d)(2). PCA argues that it has shown cause under § 362(d)(1) in several different particulars. First, it argues that Debtors' failure to adequately feed and care for their herd has seriously jeopardized the lives, health and safety of the herd and, therefore, the value of its security. PCA also argues that Debtors' failure to care for and store their equipment during the winter months has subjected the equipment to greater damage from the elements and wear and tear than is customary, causing it to depreciate excessively. PCA argues that, in any event, Debtors' failure to offer any periodic payments to it during the pendency of the case deprives it of ade-

quate protection for its interests. Under § 362(d)(2), PCA argues that the stay should be lifted as to Debtors' herd and equipment, maintaining that Debtors have no equity in any of this personal property collateral and that it is not necessary to Debtors' effective reorganization. PCA argues that the herd and equipment are not necessary to Debtors' effective reorganization, as Debtors have produced no proof that they can revive their beef cattle operation to the point where it will even pay off encumbrances against the herd, let alone generate a profit.

■ Under 11 U.S.C. § 362(d)(2), the automatic stay may be lifted as to acts against property where a creditor proves that the debtor has no equity in the property and where the debtor fails to prove that the property is necessary to an effective reorganization. PCA has met its burden and has shown that Debtors have no equity in their equipment and herd. The Court has adopted the conclusions as to real estate value reached by Raymond Brasch,

PCA's expert witness appraiser, as they are more credible than the conclusions reached by Debtors' expert. Mr. Brasch reached his conclusions after a thorough and thoughtful appraisal process, one utilizing both the "market approach" and "replacement cost approach" in accordance with standard real estate appraisal procedures. Mr. Brasch attempted to determine the *present* fair market value of the Big Meadow real estate, at its present condition and state of development. Debtors' expert, on the other hand, did not use standard methods of appraisal and did not conduct a search for comparable recent sales in the neighborhood of the subject real estate; rather, he seems to have reached his conclusion as to the "current" value of the Big Meadow real estate on more impressionistic grounds, which appear to impute some value to the real estate attributable to development which has not yet occurred.

Based upon its Findings of Fact, the Court concludes that the present value of PCA's collateral is as follows:

| | |
|---|---|
| Big Meadow real estate | $640,000.00 |
| Debtors' equipment | 50,000.00 |
| Debtors' herd (including present cash collateral) | 120,000.00 |
| Total | $810,000.00 |

The encumbrances against the Big Meadow real estate total as follows:

| | |
|---|---|
| Real estate taxes | $18,000.00 |
| PCA (as of 1/18/85) | 719,296.95 |
| Travelers Insurance Company | 79,500.00 + accrued interest |
| Farmers Home Administration | 155,560.00 + accrued interest |
| Kanabec State Bank | 52,335.00 + accrued interest |
| Total | $1,024,691.95 + accrued interest |

It is clear that Big Meadow holds no equity in its real estate, inasmuch as the total of the encumbrances outstanding against the real estate exceed its value by a sum in excess of $360,000.00. The second of PCA's two mortgages against the Big Meadow real estate is the sixth and last encumbrance in priority. Given the magnitude of the encumbrances senior to

it, this mortgage is not fully secured by the real estate and is partly secured by Debtors' herd and equipment.

PCA's sixth-priority mortgage is unsecured by the Big Meadow real estate to the extent of over $378,000.00. The value of PCA's remaining collateral (Debtors' equipment and herd) totals only $170,000.00. PCA's lien therefore fully encumbers Debt-

ors' equipment and herd, and Debtors hold no equity in their equipment and herd.

■ At trial, Debtor J. Ralph Lilyerd, Jr., testified as to his belief that Debtors' equipment and herd is necessary to an effective reorganization. Little or no other evidence was elicited on this issue. On cross-examination, Mr. Lilyerd conceded that application of the entire proceeds of sale of all of Debtors' cattle for the past four years had not been sufficient to even pay the accumulating interest on their obligation to PCA. PCA therefore argues that Debtors' prospects of reorganizing their beef cattle operation to a profit-generating status are hopeless.

PCA's argument is highly persuasive given the recent history of Debtors' beef cattle operations. However, the Court is constrained to conclude that Debtors have met their burden at this stage in the proceedings. A debtor's burden to show that a creditor's security is necessary to an effective reorganization can be met at the early stages of a Chapter 11 case by the Debtors' testimony of his belief, so long as there is some showing that use of the property is necessary to further the interests of the estate through rehabilitation or liquidation. *In Re Borchers*, 45 B.R. 69, 71 (Bankr.N.D. Iowa 1984); *In Re Taffe Brothers Farms, Inc.*, BKY 4–84–1318, slip op., at 6, (Bankr.D.Minn., October 4, 1984); *In Re Wallskog*, BKY 5–84–295, slip op., at 11, (Bankr.D.Minn., February 13, 1985). *See also In Re Koopmans*, 22 B.R. 395 (Bankr. D.Utah 1982). Debtors' belief that they can turn their beef cattle operation around may seem almost fantastic in view of their continuing inability to generate cash flow sufficient to finance its operation. Debtors' evidence of the possibility of an effective reorganization of their beef cattle operation is utterly minimal. However, the Court declines to adopt any rule that would require a debtor to produce full and accurate projections of income flow derived from use of security, to formulate a plan, and to show feasibility of the plan in the context of a stay motion brought on early in the case. The emphasis of the Court's inquiry under §

362(d)(2)(B) should be on the necessity of the property to reorganization, not on the likelihood of an effective reorganization. Because there is some small possibility that the herd and equipment will generate income which could fund a reorganization plan, Debtors have met their burden under § 362(d)(2)(B).

■ Because relief from stay under § 362(d)(2) is inappropriate, the Court's inquiry must then shift to § 362(d)(1). This section allows a Court to grant relief from stay for cause. The standard for "cause" under § 362(d)(1) is broad, and may extend beyond the one enumerated ground of lack of "adequate protection" as defined by 11 U.S.C. § 361. *In Re Rich*, 42 B.R. 350, 354 (D.Md.1984). Most frequently, cause is shown by a debtor's failure to afford adequate protection of a secured creditor's interest in its security. Once the creditor has established a prima facie case of cause under § 362(d)(1), the debtor has the burden of establishing that the creditor's interest is or will be adequately protected. *In Re Bobroff*, 32 B.R. 930, 931 (Bankr.E.D. Pa.1983). The debtor must affirmatively propose the method by which it will afford adequate protection and the Court must then determine the adequacy of the debtor's proposal. *In Re Schaller*, 27 B.R. 959, 961 (W.D.Wis.1983); *In Re Hagendorfer*, 42 B.R. 13, 16 (Bankr.S.D.Ala.1984), *aff'd*, 42 B.R. 17 (S.D.Ala.1984).

■ PCA has established a prima facie case of "cause" under § 362(d)(1), both from Debtors' ongoing failure to maintain the value of PCA's security and from Debtors' failure to adequately protect PCA's interest in its security to date.

First, Debtors have plainly and obviously failed to safeguard the herd and to provide it with adequate shelter and nutrition, and to adequately maintain their equipment. Further, Debtors have negligently failed to monitor and manage their herd in a responsible and businesslike fashion. Through January 30, 1985, Debtors failed to adequately nourish the majority of their herd, to the point where the cattle were thinner

than they should have been to maintain desirable marketability and health. Regardless of the merits of the use of the potato product as cattle feed, solely or in conjunction with hay, Debtors have failed to provide their herd with enough feed and water to carry them through the winter in satisfactory condition. Debtors have not proposed to install heated feeding or watering equipment which would insure that the herd receives an adequate amount of liquid, warm feed and water for the duration of the 1984–85 winter and future winters. Debtors have failed to provide the herd with hay of protein content sufficient to maintain weight. In addition, Debtors have failed to ensure the security of the herd from vandalism, theft, and predators. While some herd loss is to be expected from vandalism or predation in any rural environment, Debtors have negligently failed to take any steps whatsoever to monitor or minimize such losses and have not proposed any future action to minimize these losses. The Court can only conclude that the value of the herd will continue to decrease, both by the shrinkage of herd size and by the decreased marketability of surviving cattle. The value of Debtors' equipment will also continue to decrease at an abnormally high rate due to Debtors' failure to property store and service it. In addition, the value of PCA's interest in the herd and equipment is continually diminishing. Big Meadow has no equity in its real estate, Debtors have no equity in their herd and equipment, and PCA plainly is undersecured at this time. As interest accrues on the real estate mortgages senior to PCA's mortgages, the value of PCA's real estate security is continually diminished. Since Debtors have no "equity cushion" in their equipment and herd that would absorb this diminution, PCA's position is being eroded continuously. Where an undersecured junior lienor's interest is decreasing in value due to the mounting of interest on senior encumbrances, it is entitled to adequate protection in the form of cash payments, a replacement lien, or some other form which will preserve the value of its interest. *In Re Sun Valley Ranches, Inc.*, 38 B.R. 595,

599–600 (Bankr.D.Idaho 1984). So far, Debtors have failed to compensate PCA for these continuing losses.

■ The burden is therefore on Debtors to produce evidence that PCA's interest is now adequately protected, or that it will be adequately protected by some proposed course of action by Debtors. The Court dismisses out of hand Debtors' argument that PCA is presently adequately protected by an "equity cushion". As discussed earlier, there is no equity cushion. Debtors have not proposed any concrete method by which PCA will be protected from the diminution in value of its security and its interest in that security. In addition, even where a secured party is not faced with the actual or possible diminution in value of its security, the debtor must afford adequate protection in the form of interest payments to compensate an undersecured party for its loss of the present opportunity to liquidate its security and re-invest the proceeds. *In Re Briggs Transportation Co.*, 3–84 CIV 224, slip op., (D.Minn., September 26, 1984); *In Re American Mariner Industries, Inc.*, 734 F.2d 426 (9th Cir.1984). In the instant case, such adequate protection could be afforded by payments corresponding to the current interest accrual on the secured portion of PCA's claim. Debtors have made no such offer and have chosen to rely solely upon the alleged "equity cushion" as adequate protection to PCA. Debtors have effectively admitted that they do not have the ability to make such an offer, given their limited family income, uncertain prospects for future employment, long-term deferral of income from development of the Eagle Ridge subdivision, and lack of current cash flow from their beef cattle operations. Indeed, Debtors can not even afford to continue to feed and maintain the herd without the use of PCA's cash collateral. Debtors simply are not able to afford adequate protection to PCA. Because PCA is entitled to adequate protection and because Debtors have not, will not, and can not provide it, PCA is entitled to relief from stay under § 362(d)(1).

## II. Cash Collateral Issues

 Debtors have moved for an Order authorizing them to use a portion of PCA's cash collateral for the maintenance of their beef cattle operations. 11 U.S.C. § 363(d) limits a debtor's use of cash collateral to the extent that such use is not inconsistent with any relief previously or contemporaneously granted under § 362(d). Because the Court has granted relief from stay to PCA, Debtors' motion is moot.

WHEREFORE, IT IS HEREBY ORDERED:

1. That PCA is hereby granted relief from the automatic stay imposed by 11 U.S.C. § 362, for the purposes of commencing and/or continuing a replevin or claim and delivery proceeding under Minnesota state law against Debtors to obtain possession of the following described property, or the purposes of accepting a surrender from Debtors of the following described property:

> All livestock and the young of all livestock, all farm machinery & equipment & all accessions to including spare & repair parts, special tools & equipment for such farm machinery & all milk, all lease, contracts, contract rights & accounts receivable (recorded or unrecorded) arising from the sale, lease & disposition of farm products, personal property & other property of a similar nature, all supplies, all livestock feed and grain, and all crops.
> 1972 Hein Werner C12 crawler backhoe.

2. That, within seven (7) days of the date of this Order, Debtor J. Ralph Lilyerd, Jr., shall endorse the check from Producers Livestock Marketing Association payable jointly to him and PCA in the sum of $54,005.95, which is presently in his attorney's possession; Debtors' attorney shall then forward the endorsed check to PCA's attorney forthwith and PCA shall apply the sale proceeds represented by this check to the amount of its claim in these proceedings.

3. That PCA shall not commence or maintain any other action against Debtors, except as set forth in Paragraph 1 above.

4. That Debtors' motion for use of cash collateral is denied.