**STAGE I LAND COMPANY, and F Building Land Company, Appellants,**

v.

**UNITED STATES of America HOUSING AND URBAN DEVELOPMENT DEPARTMENT, Appellee.**

Civ. No. 4–86–524.

Bankruptcy Nos. 3–85–3185, 3–85–3186.

United States District Court, D. Minnesota, Fourth Division.

Aug. 14, 1986.

John M. Koneck, Esq., and Thomas E. Hoffman, Fredrikson & Byron, Minneapolis, Minn., for appellants.

Mary E. Carlson, Asst. U.S. Atty., Minneapolis, Minn., for appellee.

## MEMORANDUM OPINION AND ORDER

DIANA E. MURPHY, District Judge.

The above-entitled matter is now before the court upon an appeal by Stage I Land Co. (Stage I) and F Building Land Co. (F Building), from an order of the United States Bankruptcy Court[1] dated April 1, 1986, 60 B.R. 539 (Bankr.D.Minn.), dismissing these bankruptcy cases. After granting a motion for reconsideration, the bankruptcy court, by Order dated April 25, 1986, reaffirmed its earlier order of dismissal. Subsequent motions for a stay pending appeal were denied by this court and by the Eighth Circuit Court of Appeals. In its May 15, 1986 Order the Court of Appeals provided that the parties might agree to move to expedite the appeal of the merits in the district court. This court set the matter on for hearing as soon as the briefs were completed. The hearing was held on August 7, 1986, and the court will forego a lengthy discussion of the issues in order to expedite the proceedings.

### I.

The background of this appeal is long and involved. Stage I and F Building are partnership entities established for the pur-

---

1. The Honorable Dennis D. O'Brien presiding.

pose of owning Cedar Square West, the largest housing project in Minnesota. The general partners of each are Cedar-Riverside Properties (CRP), a limited partnership, and Cedar Riverside Associates, Inc. (CRA). The University Community Properties, Inc. (UCPI), a wholly-owned subsidiary of CRP, managed the project until the appointment of a receiver in November 1984. Keith Heller, as the individual general partner of CRP, the President and Chairman of the Board of CRA, and the President of UCPI, had primary control over the development and management of the project since its inception.

The interest of the Department of Housing and Urban Development (HUD) in Cedar Square West arose out of the assignment of five loans to it following appellants' default to their private lenders. The original loans totalled $30,556,600.00 and were insured by HUD pursuant to sections 220 and 236 of the National Housing Act, 12 U.S.C. §§ 1715k and 1715z–1. In return for HUD's acceptance of the loans, the project owner had to submit to HUD regulation its "rents, charges and methods of operation." 12 U.S.C. § 1715z–1(j)(4). The owner was authorized to use project funds to pay reasonable operating costs and necessary repairs.

Throughout its history, Cedar Square West was plagued by financial difficulties. The first residents moved into the project in April 1973. By October 1974, Stage I had defaulted on the repayment of its HUD-insured loans. Although Stage I brought the mortgages current in January 1975, default again occurred in March 1975 for one of the Stage I mortgages, and in May 1975 for the other three. Those loans continued to remain in default.

On September 29, 1975, the insured lender assigned one of the Stage I mortgages to HUD in exchange for payment of $5,494,679.00. On March 30, 1976, the insured lender assigned the other three Stage I mortgages to HUD in exchange for $22,044,006 in insurance benefits.

After the four mortgages were assigned to HUD, Stage I continued to have difficulty meeting its financial obligations. On August 30, 1977, HUD and the mortgagor entered into a provisional workout arrangement. Under this agreement, the Department agreed to hold the Stage I mortgages in default and to take no action to collect the delinquencies prior to July 1978, provided that the mortgagor made certain minimum payments to the Department and otherwise performed its obligations satisfactorily.

In August 1978, a second provisional workout arrangement was entered into under which the Department again agreed to hold these mortgages in default, and to take no collection action before June 1979.

After the expiration of the second provisional workout arrangement, the loan delinquencies continued to increase. In April 1980, the unpaid interest alone on the Stage I mortgages totalled $5,770,477.00. Trying to cure the delinquencies and to permit Stage I and F Building to retain ownership, HUD agreed to a third and unprecedented workout agreement, which gave the owner 15 years to revive the project financially. In 1980, when this workout was executed, HUD's policy was to approve workouts lasting from one to three years.

Stage I failed to meet its obligations under the workout agreement. Many of the payments due under the agreement were more than 30 days late. Starting in January 1983, payment checks for the four Stage I mortgages were returned for insufficient funds. Stage I failed to make the payments due in May 1984, and from that time until August 1984, when HUD brought its foreclosure action, Stage I made no payments under the workout. In August 1984, the arrearage under the agreement, including missed payment and delinquencies in the Project's tax escrow account, totaled more than $1,285,000.00.

Unlike the four Stage I mortgages, the fifth mortgage, covering F Building, remained essentially current until August 1984, at which time F Building failed to make the payment due. The mortgagee then assigned the mortgage to HUD on November 20, 1984, in exchange for $2,519,368.00 in mortgage insurance bene-

fits. In March 1985, HUD sought foreclosure, and the action was consolidated with the foreclosure of the four Stage I mortgages.

In the meantime, the project was the subject of several rent strikes and tenant suits, and questionable management actions were taken. By 1984, the delinquencies in the accounts of Northern States Power, Minnegasco, Minneapolis Water Works, and other service companies had grown. Threatened shut off of utilities and services was jeopardizing the health and safety of the tenants, as well as the economic viability of the project. While maintenance bills and mortgage installments went unpaid, the project prepaid UCPI $450,000.00 in management fees from 1978–1981 in violation of HUD Regulatory Agreements. A subsequent audit conducted by the Office of Inspection General for HUD concluded that, as of November 11, 1984, the project had improperly paid in excess of $1,000,000.00 in management fees to UCPI while the project was in default to HUD. Other indications of mismanagement noted in the 1985 HUD Audit included uncollected rents from CRP, UCPI, and staff; leases of commercial space at below market rents; and other questionable project disbursements. For example, a lease entered into by CRP and Stage I on November 2, 1984, two weeks before the effective date for the appointment of a receiver, allowed CRP to rent commercial space from Stage I at almost one-half the rate charged by UCPI to their lessees. The lease is signed by Keith Heller as general partner of CRP for the landlord, Stage I; by Keith Heller as general partner of CRP, the tenant; and approved by Keith Heller as President of UCPI, the manager. The 1985 Audit also noted the pledging of $285,000.00 of tenant security deposits as collateral for a 1982 loan taken out by Keith Heller for Cedar Square West—Stage I. This was listed as a violation of HUD's Regulatory Agreement with the project owners.

On November 13, 1985, the district court[2] entered a "Decree of Foreclosure and Order for Sale." The sale was scheduled for December 30, 1985. After failing to get a stay from either the District Court or from the Court of Appeals, appellants filed Chapter 11 Bankruptcy petitions on December 30, 1985, two hours before the scheduled foreclosure sale. The foreclosure sale was then cancelled. Appellants subsequently voluntarily dismissed their appeal of the foreclosure order.

On February 21, 1986, HUD filed a motion for dismissal of the bankruptcy cases on the grounds that debtors did not file their petitions in good faith. In its order dated April 1, 1986, the bankruptcy court stated that the "Decree of Foreclosure and Order for Sale" entered by the district court on November 13, 1985, was a final order that foreclosed the mortgages of Cedar Square West. The bankruptcy court concluded that the property of the estate was limited to the debtors' pre-petition interests following the district court's decree, namely, a right of possession and a right to bid at the sale. It then held that these rights were insufficient to enable the debtors to reorganize. The bankruptcy court subsequently granted a motion for reconsideration, but by order dated April 25, 1986, it reaffirmed its earlier decision. It found that even if the debtors had a right of redemption up to the time of the foreclosure sale as well as bare legal title, these rights were insufficient to permit them to reorganize.

Following dismissal, HUD republished notice of the foreclosure sale and set the sale date for May 8, 1986. Appellants filed their notice of appeal and sought a stay of the dismissal and/or the sale. The motion was denied by both the trial and appellate courts.[3] On May 8, 1986, the property was sold at public auction to HUD as the only bidder. Appellants attempted to have the

---

2. The Honorable Robert G. Renner presiding.

3. Both sides have argued over whether appellants' failure to obtain a stay and the subsequent sale have mooted their appeal. This court must always consider its own jurisdiction, but jurisdictional points related to interpretation of the circuit court's actions can best be decided by that court.

sale set aside or to have confirmation of the sale enjoined pending this appeal, but their request was denied by the court of appeals on May 13, 1986. The Honorable Robert G. Renner confirmed the sale by order of May 19, 1986, and the Marshal issued his Bill of Sale transferring all right, title and interest in Cedar Square West to HUD for $34,778,866.00.

## II.

Appellants argue on appeal that they held property interests of legal title, possession, and equity of redemption at the time the bankruptcy cases were commenced and that these interests are capable of forming the basis for their plans of reorganization. They also argue that the foreclosure sale, which took place on May 8, 1986, does not limit this court's ability to grant the relief requested.

HUD disagrees with these assertions and also urges affirmance on the grounds that the bankruptcy cases were not filed in good faith. Appellants concede that this court could affirm on any appropriate ground and that this court has the power to determine the good faith issue. *See, e.g., In re Pizza of Hawaii, Inc.,* 761 F.2d 1374 (9th Cir.1985) (district court has power to consider any issues presented by record on appeal of bankruptcy matter). *See also In re Osborne,* 42 B.R. 988 (W.D.Wisc.1984) (order of bankruptcy court must be affirmed if the result is correct, even if the basis for the decision may have been incorrect). Nevertheless, they assert that inquiry into their good faith is a factual issue best resolved by the bankruptcy court. They have submitted a supplemental reply brief on the good faith issue, however, and this court has obtained the complete record from the bankruptcy court for its own review.

■■■ Even though the bankruptcy court did not reach the issue of good faith, it makes sense for this court to consider this issue at the outset. Good faith is a jurisdictional consideration. *E.g., In re G–2 Realty Trust,* 6 B.R. 549 (Bankr.Mass.

1980). The legislative history of § 1112(b) demonstrates that the bankruptcy court has wide discretion to use its equitable authority to dismiss Chapter 11 proceedings where appropriate. H.R.Rep. No. 95–595, 95th Cong. 1st Sess. (1977) 405; S.R. Rep. No. 95–989, 95th Cong. 2d Sess. (1978) 117, U.S.Code, Cong.Admin.News 5787, 5903, 6361 (1978); *In re Northwest Recreational Activities Inc.,* 4 B.R. 36 (Bankr.N. D.Ga.1980). Once lack of good faith is raised as an issue of cause for dismissal, the debtor bears the burden of proving that the filing was made in good faith. *In re Setzer,* 47 B.R. 340, 345 (Bankr.E.D.N.Y. 1985) citing *Marine Harbor Properties, Inc. v. Manufacturers' Trust Co.,* 317 U.S. 78, 85, 63 S.Ct. 93, 97, 87 L.Ed. 64 (1942) and *In re Holi-Penn, Inc.,* 535 F.2d 841, 844 (3rd Cir.1976). After carefully considering the entire record and the parties' arguments, the court concludes that the cases were properly dismissed under 11 U.S.C. § 1112(b) because they were not filed in good faith.[4]

In the instant case, several factors lead the court to its conclusion. First, the economics of the situation make it unlikely that appellants have any reasonable expectation of reorganization. Appellants have one secured, or at least partially secured, creditor, HUD, with a claim of close to $40,000,000.00 against an asset worth at most $20,000,000.00. Nothing in the history of the project gives the impression that a reorganization would be feasible now. The project's history includes operation at a loss since its inception, threatened utility shut offs, rent strikes, a pattern of writing checks with insufficient funds, violation of regulatory agreements, default under the 1980 workout agreement and default under the district court's order. The 1980 workout agreement was similar to a reorganization attempt. Despite an influx of almost $6,000,000.00 in new investments from 1980 to 1982, appellant Stage I was unable to meet its payment schedule.

Appellants contend that it is possible to confirm a reorganization plan and ask for

---

**4.** The court has considered remanding the issue to the bankruptcy court for its consideration, but rejected that alternative due to the parties' desire to expedite these proceedings.

another two months to come up with such a plan. They have had more than enough time to come up with a detailed reorganization plan, however. The general outlines of a plan that appellants have proposed to date rely on the "cram down" provision of the Code, § 1129(b). The court is unconvinced that such a plan could be confirmed as "fair and equitable" in the circumstances presented. *See e.g. Northern Pacific Railway Co. v. Boyd,* 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913); *In re Pine Lake Village Apartment Co.,* 19 B.R. 819 (Bankr.S.D.N.Y.1982).

It is not necessary to wait until a plan of reorganization has been developed to determine whether a Chapter 11 plan is feasible or subject to confirmation. *In re Albany Partners, Ltd.,* 749 F.2d 670 (11th Cir. 1984); *In re Chesmid Park Corp.,* 45 B.R. 153 (Bankr.E.D.Va.1984); *In re Ironsides, Inc.,* 34 B.R. 337 (Bankr.W.D.Ky.1983). An inability to propose a successful plan is the basis for relief from automatic stay under § 363 and for dismissal under § 1112. It is also one of the factors determining whether a case was filed in good faith.

Second, appellants have little or no equity in the property. According to the schedules filed for the debtors, these apartment buildings had a combined value of $12,000,000.00 and were subject not only to HUD's claim of almost $40,000,000.00, but to mechanics' liens totaling around $150,000.00. Where debtors have no equity in the property, they may not argue the interests of the unsecured creditors since these creditors would be no better off under bankruptcy and the debtors have no means of proving anything approaching adequate protection to its secured creditor. *See Buffington v. First Service Corp.,* 672 F.2d 687, 690 (8th Cir.1982); *In re FJD, Inc.,* 24 B.R. 138, 141 (Bankr.D.Nev.1982). Such is the case here.

█ Third, the bankruptcy cases essentially involve a two-party dispute between the owners of the project and HUD. This dispute had already been resolved outside the bankruptcy jurisdiction. Appellants have listed numerous unsecured creditors, but these creditors have no reason to believe that their claims would be satisfied by reorganization. In fact, their claims may be unaffected by the bankruptcy proceedings since they may maintain a cause of action to collect against the managing company or CRP. Where the proposed reorganization is an apparent two-party dispute and the major secured creditor is being frustrated from enforcement of its right to foreclose, the invocation of bankruptcy court protection is improper and in bad faith. *E.g., In re Corporation Deja Vu,* 34 B.R. 845 (Bankr.D.Md.1983).

Fourth, the filing of these petitions two hours before the foreclosure sale is another indication that they were filed in bad faith. *See Furness v. Lilienfield,* 35 B.R. 1006 (D.Md.1983); *In re Fast Food Properties, Ltd. # 1,* 5 B.R. 539 (Bankr.C.D.Cal.1980). The appellants' conduct prior to the filing included last-minute requests for continuances to substitute counsel[5] during the foreclosure proceedings. During the foreclosure action, counsel for appellants indicated that they were consulting with bankruptcy attorneys, but no bankruptcy petitions were filed during the pending foreclosure action. The district court granted summary judgment and authorized foreclosure on November 6, 1985. Debtors filed an appeal of the foreclosure order on December 13, 1985, and then tried unsuccessfully to obtain a stay of the foreclosure order pending appeal. Only after these motions failed did the debtors file their Chapter 11 petitions, after which the appeal was voluntarily dismissed. The bankruptcy petitions enabled debtors to obtain the stay they were twice denied without having to post a supersedeas bond. Under these circumstances, it appears that appellants did not file their petitions for reorganization purposes, but rather as a litigating tactic designed to delay the tax ramifications of foreclosure on the CRP limited partners. *See In re Wally Findlay Galleries, Inc.,* 36 B.R. 849 (Bankr.S.D.N.Y. 1984); *In re Setzer,* 47 B.R. 340, 346 (Bankr.E.D.N.Y.1985); *In re Chesmid*

---

5. At least four law firms have been involved in these proceedings.

*Park Corp.*, 45 B.R. 153 (Bankr.E.D.Va. 1984).

In sum, the totality of circumstances presented by these cases does not support a finding of good faith. The stated purpose of Chapter 11 of the Bankruptcy Code is the rehabilitation of a viable business. Absent a reasonable possibility of an effective reorganization, a case should be dismissed at its outset for cause. In these two cases, there was no equity cushion in assets; there was not even a marginal operation with the potential for positive cash flow. Appellants' course of conduct in delaying foreclosure and in mismanagement of the project are all relevant factors to be considered in lack of good faith. *See In re Chesmid Park Corp.*, 45 B.R. 153, 157 (Bankr.E.D.Va.1984). Given the totality of the circumstances, the bankruptcy court was correct in dismissing these cases for cause.[6]

### ORDER

Accordingly, based upon the above,

IT IS HEREBY ORDERED that the bankruptcy court's orders dismissing these cases are affirmed.

6. Because of this finding, there is no need to reach the other issues presented.