**In re METRO, LTD., a Ohio Limited partnership, Debtor.**

**Bankruptcy No. 3-88-427.**

United States Bankruptcy Court,
D. Minnesota,
Third Division.

June 7, 1988.

## ORDER

DENNIS D. O'BRIEN, Bankruptcy Judge.

The matter before the Court is creditor Travelers Insurance Company's (Travelers) motion to dismiss or convert this Chapter 11 bankruptcy case. A hearing was held on April 8, 1988. Gregory Gustafson and Joseph Deuhs represented the Debtor. Tony Beitz represented Travelers. Based on the arguments and memoranda of counsel, the record and files herein, and being fully advised in the matter, the Court makes this Order pursuant to the Federal and Local Rules of Bankruptcy Procedure.

## I.

Debtor. is an Ohio limited partnership which was organized in 1976 primarily to own real property for investment purposes. It owns a single asset, a commercial building, situated on a 245,490 square foot parcel of real estate located at 7400 Metro Boulevard, Edina, Minnesota (7400 Building). Debtor does not manage the building, but has hired a management company, CIDCO Management Company, Inc., (CIDCO) to perform this function.

On May 29, 1985, Metro borrowed from Travelers 4.5 million dollars at 12.5 percent interest, to refinance a pre-existing debt on the 7400 Building. The loan is evidenced by a promissory note providing that Metro would make interest payments of $46,875.00 for 48 months and a balloon payment of 4.5 million dollars on May 31, 1989. The note is secured by a first mortgage on Debtor's property; an assignment of rents, issues and profits; and a collateral assignment of leases.

Metro defaulted on mortgage payments due in October, November and December 1987, and January and February 1988. It failed to pay taxes and special assessments due October 15, 1987. On January 7, 1988,

Travelers accelerated and demanded the immediate payment of the entire principal balance and accrued interest owing. It scheduled a hearing to appoint a temporary receiver for Tuesday, February 16, 1988. Metro filed for bankruptcy under Chapter 11 on February 12, 1988. At that time, it owed Travelers a principal balance of 4.5 million dollars, and interest in the approximate amount of $175,000.00. It owed the Minnesota Department of Revenue approximately $237,000.00 in accrued and unpaid real estate taxes.

Prior to 1987, Debtor made a substantial profit. From 1981 to 1986, tenants occupied at least 93 percent of the 7400 Building's available space and in 1986 tenants occupied 97 percent of its space. Each of Debtor's partners has received cash distributions totalling $65,653.00 on investments of $16,500.00.

In 1987, Debtor encountered several major problems which adversely affected its financial condition. Most significantly from Debtor's standpoint, it discovered that the 7400 Building was insulated with asbestos containing material (ACM). Debtor obtained preliminary assessments of the extent of this problem and has begun to investigate cost-effective environmentally safe responses to it. It estimates that it needs three to four months to determine the full impact that the problem will have on the operation of the building and the cost involved. Based on some bids received to remove the ACM from certain areas of the building, however, Debtor projects that the cost involved will not be in excess of $1,000,000.00.[1]

Debtor also lost two major tenants in 1987, apparently for reasons unrelated to the management of the building.[2] Occupancy of the building is presently at about 70 percent and Debtor concedes that the

---

1. Debtor stated in a January 11, 1988, letter by one of its general partners to Travelers' manager of investments, that the cost might be as high as $2,000,000.00. This statement has no apparent foundation, and was made in the context of a letter depicting Debtor in an unfavorable light, in an effort to obtain a cash flow mortgage from Travelers. Debtor's attorneys stated at the hear-

ing that the general partner who authored this letter has been removed from the partnership.

2. One tenant reduced its operations in the Minneapolis/St. Paul area; the second tenant terminated its tenancy as a result of its filing for bankruptcy.

real estate market in the Minneapolis/St. Paul area currently is "soft".[3]

Finally, Debtor discovered that a 5,000 gallon underground fuel tank on the property was leaking fuel oil. Removal of the tank appears necessary, and Debtor estimates that removal and replacement will cost approximately $10,000.00.

Debtor currently is not generating a sufficient cash flow to service its debt to Travelers.[4] The parties dispute whether Debtor has equity in the property. Travelers asserts that the property has, at most, a value of 4.5 million dollars and that it is depreciating. Debtor claims the property is worth 7.1 to 8.3 million dollars and that it is appreciating in value.

Travelers argues that Debtor cannot generate the cash flow or obtain financing necessary to: pay the cost of remedying the physical problems of the building, market its vacant space, pay back taxes, and service the debt to Travelers. It contends Debtor will not succeed in obtaining new tenants in light of the asbestos problem and soft real estate market and, that even if it could obtain the tenants, the terms of their leases would have to be such that they would not be income producing to Debtor for two to three years. It asserts that no lending institution will accept as collateral for a loan, a building with the loan-to-value ratio and physical problems of the 7400 Building.

Travelers requests that this case be dismissed, claiming: (1) Debtor is not eligible to file under Chapter 11 as it is merely a passive investor, not a business; (2) Debtor filed its petition solely to delay foreclosure and therefore in bad faith; (3) Debtor will not be able to confirm a plan of reorganization; and (4) the building is depreciating and Debtor has no reasonable likelihood of rehabilitation.

Debtor argues that it is eligible for protection under Chapter 11 of the Bankruptcy Code and that there is insufficient cause at this stage of the bankruptcy to convert or dismiss this case.

## II.

### A.

■ Chapter 11 may be used only by persons engaged in a business. *Wamsganz vs. Boatmen's Bank of DeSoto*, 804 F.2d 503 (8th Cir.1986). The Debtor in this case is engaged in a business.

Limited partnerships are used by persons for investment purposes; however, this use does not transform what is unquestionably a legitimate form of business organization, into merely an investment vehicle. A limited partnership in Minnesota, by definition, is an association of persons to carry on a business.[5]

■ The fact that the limited partnership in this case has only one asset does not alter the conclusion that it is engaged in a business. For the limited partnership to succeed, marketing decisions must be made, tenants sought, leases approved, financing obtained, and building improvements constructed periodically. If successful, the limited partnership generates a profit for the benefit of its partners. Ownership and operation of the 7400 Building clearly is a business.

The fact that the limited partnership hires an outside management company to manage the building also does not alter the conclusion that it is carrying on a business. In a limited partnership, the general partner has ultimate control over, and responsi-

---

**3.** The January 11, 1988, letter also stated that the 7400 Building needed substantial improvements to enhance its marketability. Debtor stated in its responsive memorandum that this statement was incorrect.

**4.** Its schedule of current income and current expenditures shows that it has a monthly income of approximately $74,000.00 and expenses, including mortgage payments due Travelers, of $92,224.50.

**5.** A partnership is defined as "an association of two or more persons to carry on, as co-owners, a *business* for profit." MINN.STAT. § 323.02, subd. 8 (emphasis added). A limited partnership is "a partnership formed by two or more persons under the laws of this state and having one or more general partners and one or more limited partners." MINN.STAT. § 322A.01, subd. 7.

bility for, the affairs of the business.[6] Here, this is manifested through the general partners' selection, hiring, and supervision of the property manager;[7] its power to fire the manager if it is not in agreement with the decisions made; and its unlimited liability.

It appears that Congress contemplated the use of Chapter 11 by single asset real estate limited partnerships. Single asset real estate cases were permitted under the reorganization provision of the Bankruptcy Act and Congress did not prohibit them under Chapter 11 of the Bankruptcy Code. In fact, it appears that enactment of § 1111(b) was, in part, a response to a decision in a single asset real estate limited partnership case, *In re Pine Gate Assoc., Ltd.*, 6 B.C.D. 301 (Bankr.N.D.Ga.1977). *See* Norton Bankr.L. & Prac.Bankr.Code § 1111, Editor's Comment (1987–1988 ed.).

This Court recently determined that two individual farmer debtors who filed under Chapter 11 were not eligible for protection under that Chapter, where their sole "business activity" was the leasing of their real estate to a farming partnership which actually farmed it. *In re Fosness*, BKY 4–86–3510 (D.Minn. Dec. 29, 1987). Travelers argues that *Fosness* controls here. But the facts of this case are not like those in *Fosness*.

The Fosnesses leased their farmland to a family partnership, which was not a debtor in the bankruptcy. The partnership actually was the business that conducted the farming operation and generated the profits. The Fosnesses did not fully control the partnership; one debtor was not a partner, and the other had only a one-half interest in it. The Fosnesses, in effect, filed for bankruptcy simply to restructure the indebtedness on their farmland.

In this case, the Debtor to be reorganized owns the property securing the indebtedness and controls the business of operating that property.

**B.**

11 U.S.C. § 1112(b) provides in relevant part:

(b) Except as provided in subsection (c) of this section, on request of a party in interest or the United States trustee, and after notice and a hearing, the court may convert a case under this chapter to a case under Chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause, including—

(1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation;

(2) inability to effectuate a plan;

.      .      .      .      .

■■■ In addition to the causes enumerated under § 1112(b) for conversion or dismissal, cause exists to dismiss a Chapter 11 petition if it was not filed in good faith. *Stage I Land Co. v. U.S. Dept. of HUD*, 71 B.R. 225 (Bankr.D.Minn.1986). The Court concludes there is insufficient cause to convert or dismiss this case at this point in the bankruptcy.

Initially, the Court finds that the Debtor filed for bankruptcy under Chapter 11 for the purpose of reorganizing and in good faith. Debtor is attempting to work out a solution to the asbestos problem, seek new tenants, solicit equity contributions, seek lenders willing to loan against a building containing asbestos, and refinance or restructure its indebtedness to Travelers. As discussed below, Debtor has a reasonable likelihood of reorganizing and the potential to confirm a plan of reorganization. This Debtor did not file for bankruptcy simply to delay Traveler's foreclosure of the 7400 Building.

The ramifications of Debtor's asbestos problem are still unknown, and Debtor has not yet obtained the financing needed to address its problems or service its debt.

---

**6.** The limited partners are passive; their sole function is to serve as a source of capital and generally their only interest is to make a profit. By law, they cannot control the business.

**7.** At the hearing, Debtor's attorneys claimed that Debtor's general partner, Meta Operating Limit-

ed Partnership, through its officers, supervises the day-to-day activities of CIDCO; the officers meet with CIDCO once every six weeks, receive reports from CIDCO, approve leases, and are currently involved in resolving the asbestos problem.

Nonetheless, Debtor presented evidence sufficient to demonstrate a reasonable likelihood that it can reorganize.

First, the Court notes that prior to 1987, Debtor operated very successfully.

Second, Debtor has embarked on a serious effort to deal with the asbestos problem: it obtained preliminary reports evaluating the extent to which ACM is present in the building; initiated a program to contain and remove the ACM; and has taken steps to insure that the building's occupants are not exposed to adverse levels of the ACM. It obtained opinions that the ACM may not have to be removed at least from some areas of the building; that containment may be all that is needed to adequately address the problem.

Third, Debtor presented an appraisal and several affidavits in proof of its contention that the 7400 Building has equity in it. It has discussed financing with lenders and concluded that loans will be made against a building containing ACM, where the problem is being properly and thoroughly managed through some type of program.[8] Debtor is convinced that its limited partners will make equity contributions to this reorganization, rather than lose the building in a foreclosure.[9] Finally, it asserts that it has various other means through its association with real estate partnerships to raise equity capital.

Lastly, Debtor provided evidence that it can generate a positive cash flow. It hired a real estate firm to market the vacant space in the 7400 Building. A leasing agent of the firm stated by affidavit that the public interest in leasing space in the 7400 Building has increased markedly since Debtor made improvements in the building in 1987; that currently, several businesses are considering leasing space in the building; and, that the building can be fully leased by the end of 1988.

Travelers asserts that Debtor's evidence of an ability to reorganize is inaccurate and misleading. Its major objection is that the Debtor's appraisal of the building and claimed ability to cash flow a plan are overstated in light of the fact that even if Debtor could obtain new tenants, tenant improvements and concessions made to obtain them would render their tenancies non-income producing for at least two years. Balancing this against the totality of Debtor's evidence, the Court believes a reasonable likelihood of reorganization exists.

Further, Debtor has potential to meet other requirements specifically addressed by Travelers, needed to confirm a plan of reorganization. In addition to making its feasibility argument, Travelers stated that a plan could not be confirmed as it was the only listed creditor at the time it filed its motion, its claim would necessarily be impaired, and it would not consent to a plan of reorganization. Debtor owes money to the Minnesota Department of Revenue and has since filed completed schedules showing numerous unsecured creditors; thus, at this point in the bankruptcy, it is not certain that Travelers acceptance of a plan is necessary. Moreover, it is not altogether clear at this point that Debtor will be unable to refinance Traveler's debt. Travelers also indicated that a plan cannot be confirmed as Travelers will not receive under Chapter 11 what it would receive if Debtor were liquidated. At this time, in light of Debtor's evidence, the Court cannot conclude that this is true.

Finally, from Debtor's evidence demonstrating that it has implemented steps to remedy the physical problems of the building and improve its marketability, it appears that Travelers' collateral will not significantly decrease in value if Debtor is allowed to proceed to confirmation. Based on all of the above,

IT IS HEREBY ORDERED: The motions of Travelers Insurance Company are denied.

---

8. Debtor submitted a letter to the Court by one lender who was aware of the asbestos problem, and interested in discussing Debtor's refinancing needs.

9. Tax considerations appear to be the motivating factor; Debtor's limited partners will incur tax obligations of approximately $20,000.00 in a foreclosure.