**In re MARION STREET PARTNERSHIP, Debtor.**

Bankruptcy No. 4–89–4616.

United States Bankruptcy Court, D. Minnesota.

Dec. 7, 1989.

**220**

Christopher A. Elliott, Christoffel & Elliott, P.A., St. Paul, Minn., for debtor.

Richard D. Holper, Robins, Kaplan, Miller & Ciresi, Minneapolis, Minn., for movant TCF Bank Sav.

## MEMORANDUM ORDER

NANCY C. DREHER, Bankruptcy Judge.

The above-entitled matter came on for final hearing before the undersigned on the 7th day of November, 1989 on a motion by TCF Bank Savings fsb ("TCF") to convert or dismiss the case and for relief from the automatic stay, and on a motion by the debtor for use of cash collateral. Appearances were as follows: Richard Holper for TCF, and Christopher Elliott for debtor Marion Street Partnership ("Debtor"). This Court has jurisdiction to hear and finally determine this matter pursuant to 28 U.S.C. §§ 157 and 1334, and Local Rule 103. This is a core proceeding.

## FACTS

Debtor is a Minnesota general partnership whose sole asset is a 174 unit apartment building located at the corner of Larpenteur Avenue and Marion Street in Roseville, Minnesota. There are two general partners, David P. Stewart and Byron C. Helgeson. Stewart is an experienced Twin Cities real estate developer. He is also a principal in Tycon Management, Inc. ("Tycon"), which has from time to time managed the apartment building for the partnership. Helgeson is also an experienced real estate investor, and is involved in a different property management company. Stewart and Helgeson formed the partnership on July 1, 1986. Their intention was to syndicate limited partnership interests in the building for purposes of throwing off tax losses. Initially, there was no intention to operate the apartment building on a positive cash flow basis. The Tax Reform Act of 1986 interrupted this plan and made syndication impossible.

Debtor financed the purchase of the property using the proceeds of a loan from TCF in the sum of $4,000,000.00. That loan was evidenced by a Promissory Note dated July 18, 1986 (the "Note"), which was secured by a Mortgage, Security Agreement and Fixture Financing Statement (the "Mortgage"), which contained an assignment of rents. The Mortgage was duly filed, and the security interest of TCF became a first lien on the property. The Note bears interest at an annual rate of 10%. There is also a second mortgage on the property in the sum of approximately $700,000 held by Peerco I Limited Partnership ("Peerco"). On the date the petition was filed, the indebtedness to TCF was in the sum of approximately $4.1 million.

The apartment building is 25 years old. It is currently operating at a 95% occupancy rate. Since the partnership has owned it, the property has never generated sufficient cash flow to service the first and second mortgage indebtedness, after payment of operating expenses and real estate taxes. For the first several years of operations, debtor was required only to make interest, but not principal, payments to TCF. As of July 1988, however, debtor was required to begin making principal payments as well. Debtor was unable to do so, and TCF agreed to defer this obligation. Debtor made all payments to TCF through August 1989 in a timely fashion, with the exception of one late payment of interest in February, 1989, which was promptly cured. In August, 1989, it missed its interest payment, and by the date the petition was filed, debtor was in arrears in interest payments in the sum of $121,000. It had also failed to escrow sufficient funds to pay the real estate taxes, which would come due on October 15, 1989, and to escrow insurance payments. It had been behind in making payments to Peerco on the second mortgage for some time.

In September, 1989, Peerco notified debtor that it intended to take legal steps to foreclose. At about the same time, TCF notified the debtor that it would have until September 30, 1989 to cure arrearages. Neither the first nor the second mortgagees had commenced foreclosure proceedings or taken steps to sequester the rents prior to the debtor's filing for relief under

Chapter 11 of the Bankruptcy Code on September 26, 1989.

Debtor's schedules reflect TCF's and Peerco's statuses as two of debtor's three secured creditors, with total secured debt of approximately $5,000,000. There are few unsecured creditors, the total unsecured debt being less than $20,000. Debtor employs approximately 16 people as caretakers, managers and similar, some of whom receive rent credits in lieu of salary. The property is currently managed on a day to day basis by Tycon.

Financial statements and testimony presented at the hearing indicate that in the coming year, assuming current occupancy levels, the partnership will have net operating income of approximately $337,-000 after payment of operating expenses and current real estate taxes. Based on historical experience, these projections appear realistic. The projections also indicate that debtor will have sufficient cash flow to pay approximately $108,000 in necessary repairs and maintenance items in the coming year and to pay past-due real estate taxes on the property in the sum of approximately $84,000. Debtor will not, however, have sufficient cash flow to pay the annual debt service of approximately $400,000. Thus, at current occupancy levels, which are high, the property can sustain its operating expenses, real estate taxes, and repair and maintenance, but it cannot now produce sufficient revenue to pay the current debt, and probably never will be able to do so. As Stewart testified, with its current debt structure, the property will not work.

As is typical, the estimates of value in this single asset case differ. The property has been appraised at various times, and there was valuation testimony presented at the hearing. In 1986, an independent appraisal prepared for TCF reflected a value on the property of approximately $4.7 million. Since that time, the partners put an additional $750,000 into the property. At trial, Stewart, who holds a master's degree in real estate appraisal and who, as previously noted, is familiar with the Twin Cities real estate market, valued the property between $3.3 and $3.7 million. His estimate of value was based on the traditional, income-stream approach to valuation, coupled with a review of comparable sales in the area. He explained that, as a result of the Tax Reform Act, properties such as this one have suffered a decline in value because of their original tax driven nature. Most recently, the Department of Housing and Urban Development ("HUD") appraised the property at approximately $4.3 million. TCF relies on the HUD appraisal for purposes of these motions.

While this is by no means an exact science, especially where neither party has obtained a current, independent appraisal in connection with the bankruptcy case, I believe that the value of the property is in the range of $3.7 million to $4.0 million. The debtor's schedules listed the property at $3,785,000. This figure appears to be very much in range of the true current market value. There are ample reasons to ignore the early TCF appraisal, to accept debtor's high-end figure, and to discount the HUD appraisal. *First,* Stewart's testimony was eminently credible. Generally, a property owner's *ipse dixit* on valuation is of dubious merit. Stewart, however, possesses credentials and experience uncommon to property owners appearing before this Court, and his valuation opinion was supported by analysis. His explanation of the current situation with respect to the property was reasonable and understandable. He used a standard appraisal technique, the income-stream approach, and did so competently. TCF did not even attempt to impugn his methodology, capitalization rates, assumptions, or calculations, and it did not obtain its own separate appraisal for the property. *Second,* as debtor pointed out, the HUD appraisal was premised on a number of unfounded assumptions. HUD prepared its appraisal in connection with debtor's loan application for HUD refinancing, which application has been approved. The HUD appraisal assumed that the property would qualify for an immediate tax reduction (which is itself contingent on the property being financed by HUD), that substantial improvements would be made to the property, and that the property

would have a lower debt service requirement than that currently in place. Such assumptions, if eliminated for the normal market purchaser, would bring the HUD appraisal into line with the debtor's appraised value.

There is no evidence that the property is declining in value. The property is fully insured. Debtor is maintaining the property and has the cash flow with which to pay back and coming-due real estate taxes and to make most of the necessary repairs for the coming year. Tycon is currently managing the property for compensation at a rate of 5% of collected rents, a figure which is consistent with the Twin Cities market. Operating expenses as a percentage of gross rents are within a reasonable range. TCF has not established or attempted to establish that Tycon is mismanaging the property. Nor has TCF established that Tycon has intermingled the funds of debtor with related partnerships. It has established, however, that neither Stewart nor Helgeson has the funds or inclination to infuse more of their own personal funds into the debtor partnership for purposes of effecting a reorganization.

## DISCUSSION

TCF has moved to dismiss or convert, and at the same time has moved to lift the stay to allow it to proceed to foreclose on its mortgage. In response, the debtor has moved for the opportunity to use cash collateral, namely the rents from the property. TCF brought its motions less than one week after the debtor filed its voluntary petition in Chapter 11.

### A. Motion to Dismiss

TCF moves to dismiss "for cause," asserting that this is a single asset case which essentially involves a two party dispute, and that the debtor has filed for relief with no good faith intention of reorganizing. I do not find sufficient evidence of bad faith, and therefore I will deny the motion to dismiss.

■ Section 1112(b) of the Bankruptcy Code authorizes the Court to dismiss a Chapter 11 filing "for cause," including the enumerated reasons provided therein. 11 U.S.C. § 1112(b). It is appropriate to dismiss a case for cause if the Court finds that the debtor has filed its Chapter 11 petition in "bad faith". *Carolin Corp. v. Miller*, 886 F.2d 693, 700 (4th Cir.1989); *In re Winshall Settlor's Trust*, 758 F.2d 1136, 1137 (6th Cir.1985); *Little Creek Dev. Co. v. Commonwealth Mortgage Co. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1072 (5th Cir.1986); *Phoenix Piccadilly, Ltd. v. Life Ins. Co. (In re Phoenix Piccadilly, Ltd.)*, 849 F.2d 1393, 1394 (11th Cir.1988). "Bad faith" has come to mean different things to different persons, usually dependent on whether that person is a secured creditor or a debtor. It is common, however, for a secured creditor to cry "bad faith" where the case involves a debtor with a single asset, no meaningful unsecured debts, and there has been an ongoing controversy between two parties, i.e., the secured creditor and the debtor. *Stage I Land Co. v. United States*, 71 B.R. 225, 229–30 (D.Minn.1986); *In re One Fourth Street North, Ltd.*, 105 B.R. 106 (Bktcy.M.D.Fla.1989); *In re Mill Place Ltd. Partnership*, 94 B.R. 139 (Bktcy.D.Minn.1988). A partial laundry list of factors to be considered in determining "bad faith" was provided in the recent Eleventh Circuit case of *Phoenix Piccadilly, Ltd.*:

1. Whether the case involves a single asset;

2. Whether there is a small number of unsecured creditors whose claims are small in relation to the claims of the secured creditors;

3. Whether the debtor has a small number of employees;

4. Whether the debtor's financial problems involve essentially a dispute between the debtor and the secured creditors which can be resolved *via* state court actions; and

5. Whether the filing was made on the eve of a state court foreclosure proceeding. *Phoenix Piccadilly, Ltd.*, 849 F.2d at 1394–95.

An even more detailed laundry list of items to be considered is presented in *Lit-*

tle Creek Development Co. The *Little Creek* court's list includes, in addition to those listed by the *Phoenix Piccadilly* court, factors such as little or no cash flow, no available sources of income from which to make adequate protection payments, possible wrongdoing by the principals, an appearance that comports with the "new debtor syndrome," and an inability of the debtor's principals to infuse necessary capital into the debtor. *Little Creek Dev. Co.*, 779 F.2d at 1073. Other cases in this district and elsewhere refer also to the question of whether there is actually any ongoing business to reorganize, and whether there is a reasonable probability of a plan being proposed and confirmed. *See, e.g., In re Winshall Settlor's Trust*, 758 F.2d at 1137; *Stage I Land Co.*, 71 B.R. at 229.

■ Dismissal of a bankruptcy case is the ultimate sanction; it should be used with caution. *In re Mill Place Ltd. Partnership*, 94 B.R. at 141. The mere fact that this is a single asset case does not demonstrate that the filing was made in bad faith. *In re Metro, Ltd.*, 108 B.R. 684, 686 (Bktcy.D.Minn. 1988); *In re One Fourth Street North, Ltd.*, 105 B.R. 106. Single asset reorganizations were allowed under the former Bankruptcy Act, and there is nothing to suggest that when Congress enacted the Bankruptcy Code and merged former Chapters X, XI, and XII of the Bankruptcy Act into Chapter 11, it intended to disallow such a practice. *In re Sarasota Plaza Assocs. Ltd. Partnership*, 102 B.R. 257, 258 (Bktcy.M.D.Fla.1989); *In re One Fourth Street North Ltd.*, 105 B.R. 106. Nor is bad faith necessarily to be assumed where the debtor files for bankruptcy on the eve of foreclosure. *In re Mill Place Ltd. Partnership*, 94 B.R. at 142. Such timing is common where attempts to work solutions outside the context of the bankruptcy court have failed. Nor is inability to pay debt service controlling. Virtually every Chapter 11 debtor, in a single asset case and otherwise, is having difficulty paying debt service at the time it files. *See, e.g., In re Metro, Ltd.*, at 685. Rather, in a single asset case particularly, and in Chapter 11 filings generally, I

look to the totality of the circumstances and scrutinize the evidence to determine, on an objective basis, whether there is some reasonable possibility of successful reorganization without inordinate delay and whether the debtor entered the bankruptcy process with any real intention to reorganize rather than stall. *In re Mill Place Ltd. Partnership*, 94 B.R. at 139 (dismissal granted; debtor threatened "scorched earth" policy entailing retreat into Chapter 11, and successful reorganization was highly unlikely); *In re Metro, Ltd.*, at 688 (dismissal denied; debtor demonstrated that it had equity in the property and that it could generate a positive cash flow in the future); *In re Sarasota Plaza Assocs. Ltd. Partnership*, 102 B.R. at 259 (dismissal denied; debtor demonstrated an ability to reorganize without inordinate delay); *In re Fourth Street North, Ltd.*, 105 B.R. 106 (dismissal denied; property was producing income and cash flow, and debtor explained plans reorganize). I agree with TCF when it asserts that the analysis should be made on an objective, not a subjective, basis.

■ Application of the foregoing principles to the facts at hand leads me to conclude that a dismissal is not appropriate in this case. Debtor has carried its burden of showing that it has a real intention to attempt to organize and that there are ways to do that, even though they may be difficult. Debtor has been negotiating with the Department of Housing and Urban Development, which is committed to infusing capital into the project, albeit under terms and conditions that may not be acceptable to the debtor. There is sufficient cash flow to pay on-going expenses, to assure payment of real estate taxes and to keep the property insured and the upkeep intact. Debtor has been negotiating with other lenders and has demonstrated that if certain events occur, such as a reduction of the real estate taxes and a refinancing (perhaps with government help) at a slightly lower interest rate, it will be able to reorganize. While there was no evidence that debtor has protested the current real estate tax valuation of its property,

there is evidence that real estate tax reductions are a distinct possibility under some government financing arrangements. The HUD financing proposal carries an interest rate which is lower than that on the current Note to TCF (although there may be offsetting considerations because of the participatory nature of HUD financing). Debtor has been working with a mortgage banker and broker, who has had some success in interesting potential lenders in the property, and who is still engaged for that purpose. Debtor's principals, moreover, are not absentee managers, but rather are knowledgeable in property management, have kept the property at high occupancy levels, and appear committed to an attempted restructuring, especially because of their personal stakes in the debtor's success. Finally, while there was a suggestion that debtor engaged in an attempt to sell the property to a "new debtor," thus leaving the instant debtor with no assets and nothing to reorganize, the evidence did not sustain such a conclusion.

Thus, the motion to dismiss will be denied. But, as will be indicated below, that denial will not come without a cost to the debtor.

### B. Motion to Lift the Stay

Relief from the automatic stay provided in 11 U.S.C. § 362(a) will be granted under one of two circumstances. Relief is appropriate under section 362(d)(1) "for cause, including the lack of adequate protection of an interest in property of such party in interest," or under section 362(d)(2) where "(A) the debtor does not have an equity in the property; and (B) such property is not necessary to an effective reorganization." 11 U.S.C. §§ 362(d)(1) and (2). Except as to the issue of lack of equity, the debtor has the burden of proof. 11 U.S.C. § 362(g); In re Lilyerd, 49 B.R. 109, 114 (Bktcy.D. Minn.1985). Because relief from stay is a lesser evil as far as the debtor is concerned, courts are generally more willing to grant such relief than to dismiss the case.

TCF asserts that it has grounds for relief from stay under both sections 362(d)(1) and (2). I do not agree.

### 1. Cause, Including Lack of Adequate Protection.

TCF asserts that cause exists because debtor has filed this petition for relief under Chapter 11 in bad faith. While a "bad faith" filing may give rise to relief by way of either dismissal or a lifting of the automatic stay, Little Creek Development Co., 779 F.2d at 1072, I have already determined that this is not a filing in bad faith within the meaning of those cases. Accordingly, the mere filing does not give rise to cause for lifting the stay.

TCF next asserts that it is not being adequately protected because the property is declining in value and the rents are being dissipated. Because TCF is slightly undersecured, it is not entitled to damages that it may suffer as a result of the delay occasioned by the filing of a bankruptcy petition, other than being compensated for potential declines in the value of the collateral, measured from its value as of the date of the filing of the petition. United Sav. Ass'n v. Timbers Assocs., 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). The interest in property that is to be protected by section 361 of the Bankruptcy Code is the value of the collateral, not contractual or legal rights such as receiving interest or being permitted to foreclose on default:

> The phrase 'value of such creditor's interest' in § 506(a) means 'the value of the collateral.' We think the phrase 'value of such entity's interest' in § 361(1) and (2), when applied to secured creditors, means the same.

Timbers Assocs., 108 S.Ct. at 630 (citation omitted).

As previously noted, there is inadequate evidence that the property is declining in value. Rather, it appears that the property is being fully maintained with cash flow in sufficient sums to pay operating expenses and to pay the real estate taxes and needed maintenance. The property is not bare land, but rather an operat-

ing building nearly 100% occupied. Management is competent and concerned enough to keep the property intact. There is some potential for an early resolution for the reorganization. Thus, the interest of TCF in the property is being adequately protected to the extent required by law.

 This is also true with respect to the rents. The rents are cash collateral within the meaning of 11 U.S.C. § 363(a) because, according to the current decisions in this district, TCF has a first, duly perfected interest in those rents. *New York Life Ins. Co. v. Bremer Towers,* 714 F.Supp. 414 (D.Minn.1989); *Northwestern Nat'l Life Ins. Co. v. Metro Square (In re Metro Square),* 93 B.R. 990 (Bktcy.D.Minn.1988). But, the evidence demonstrates that the rents are not being dissipated; rather, they are being used to pay the operating expenses, real estate taxes and required maintenance and repair. Therefore, TCF has failed to establish a decline in the value of its collateral or that it is not being adequately protected with respect to the rents.

For the foregoing reasons, then, TCF is not entitled to relief from stay pursuant to section 362(d)(1).

2. Lack of Equity and Unnecessary for Effective Reorganization.

 The debtor has admitted that it has no equity in the property. This leaves only one remaining issue to decide; *i.e.,* whether "the property is essential for an effective reorganization *that is in prospect." Timbers Assocs.,* 108 S.Ct. at 632 (original emphasis). I conclude that the debtor has met its burden of establishing that the property is necessary to its reorganization, whether the debtor is held to a feasibility, a modified feasibility, or a necessity test. *Id.* at 632–33; *In re Metro Square,* No. 4–88–2117, slip op. at 15–16 (Bktcy.D.Minn. Aug. 12, 1988); *In re Rassier,* 85 B.R. 524, 528 (Bktcy.D.Minn.1988). In other words, I conclude that the debtor has adequately established that there is "a reasonable possibility of a successful reorganization within a reasonable time." *United Sav. Ass'n v. Timbers Assocs.,* 808 F.2d 363, 370–71

(5th Cir.1987) (*en banc* ), *aff'd* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

I reached this conclusion, in part, because debtor's burden of showing a likelihood of reorganization was lessened as a result of TCF's decision to file its motion so close on the heels of this case's commencement. As the Supreme Court noted in *Timbers Assocs.,* "the bankruptcy courts demand less detailed showings during the four months in which the debtor is given the exclusive right to put together a plan." 108 S.Ct. at 632–33. Debtor would have been required to make a stronger showing had TCF allowed debtor more time to develop its reorganization efforts:

> Somewhat like the ratios, rules and formulas of long ago Physics Classes, there might be said to be a formula that Bankruptcy Judges may apply. In such terms it perhaps could be stated as follows:
>
>> The quantum and quality of evidence, as to the likelihood of successful reorganization, needed to defeat a motion to lift stay, is inversely proportional to the length of time from the petition date.
>
> Or for lawyers [or jurists such as myself] without the benefit of scientific undergraduate studies, it might be stated: "The older the case, the better it has to look."

*In re Eisentrager,* 102 B.R. 181, 182 (Bktcy.W.D.Mo.1989).

Debtor provided ample evidence, for this stage in the proceedings, to support a finding that there is a reasonable possibility of a successful reorganization within a reasonable period of time. As previously noted, there was a dearth of evidence that debtor's petition was filed for the sole purpose of delay. Reorganization will take an infusion of capital, which the debtor's principals cannot and/or will not provide. But that does not mean, as TCF asserts, that the debtor "will not" be reorganized. It is possible that it will not, but it appears to me that is also possible that it will. There is at least one source of funding available, and the debtor has taken some positive steps to find additional sources of capital. TCF's assertion that debtor has been at-

tempting to reorganize for over 15 months seems exaggerated. Rather, debtor's serious efforts at finding additional capital appear to have been instituted within the last 6 to 9 months, and those attempts have been partially successful. There is something to be said for debtor's position that the delay in obtaining the HUD commitment was largely due to that agency's propensity for delay. This is not to say that the Court should ignore the realities of the market place or give the debtor unlimited time to maneuver, but it is to say that based on the evidence *at this point in the proceedings,* debtor has met its burden of showing a reasonable possibility of success at effecting a relatively expeditious reorganization.

Thus, for the reasons stated above, TCF is not entitled to relief from the automatic stay under section 362(d)(2) of the Bankruptcy Code.

### C. Debtor's Motion For Use of Cash Collateral

According to TCF, the rents generated by debtor's property are the cash collateral of TCF, which debtor is not entitled to use unless it provides adequate protection to TCF. *See* 11 U.S.C. §§ 363(a) and (e). Debtor responds, first, that TCF does not have any rights in those rents because it had not enforced its assignment of rents prior to the filing of the petition, and second, that TCF is adequately protected. Such adequate protection is provided, debtor asserts, by the debtor's commitment 1) to use the after-acquired rents only to pay operating expenses, including real estate taxes, as well as needed repairs and maintenance costs; 2) not to use the rents to pay distributions to the partners; and 3) to deposit any excess in a separate escrow

account for the benefit of TCF. Since these are the very strictures that would confine a state court receiver appointed at the commencement of any foreclosure under Minnesota law, debtor argues that TCF is no worse off in this bankruptcy that it would be if it had the use of the rents during the foreclosure and redemption periods. It is obvious that the debtor cannot operate one day unless this Court makes permanent its earlier interim order allowing the debtor use of cash collateral under the foregoing terms and conditions pending the issuance of this Memorandum Order.

■ The disputed rents are the cash collateral of TCF. *See* 11 U.S.C. § 363(a). The assignment of rents contained in TCF's mortgage is valid pursuant to Minn.Stat. § 559.17, subd. 1. An assignment of rents made valid by that statute grants an interest in real estate,[1] which is "perfected" by recording the instrument containing the assignment. *Bremer Towers,* 714 F.Supp. 414; *Metro Square,* 93 B.R. 990; *In re Pavilion Place Assocs.,* 89 B.R. 36 (Bktcy. D.Minn.1988). *But see, Capitol Realty Investor Tax Exempt Fund Ltd. Partnership v. Greenhaven Village Apartments Phase II Ltd. Partnership (In re Greenhaven Village Apartments Phase II Ltd. Partnership),* 100 B.R. 465, 469 (Bktcy.D. Minn.1989) ("perfection" not dispositive issue in resolving competing interests in rents). Once an assignee has recorded a mortgage containing an assignment of rents, the assignee has an interest in rents superior to that of any assignees who record subsequently. *Greenhaven Village Apartments Phase II Ltd. Partnership,* 100 B.R. at 470. Enforcement is not required to establish such a superior interest.[2] *Id.* at 468–69. If an assignee obtains

---

**1.** Assignments of rents valid under Minnesota law as it existed prior to the enactment of Minn. Stat. § 559.17, subd. 1 may grant interests in personal property rather than real property. *Greenhaven,* 100 B.R. at 469 n. 6; *United Fed. Sav. Bank v. Johnson (In re Johnson),* No. 4–89–98, slip op. at n. 13–14 n. 6, 108 B.R. 689, 695 n. 6 (Bktcy.D.Minn. Nov. 22, 1989). Thus, recording such an assignment of rents may not be sufficient to establish an interest in rents enforceable against third parties.

**2.** This holding seems plainly contrary to the law of assignments of rents universally recognized in "lien theory" states:

> [A] creditor with a prior-recorded assignment of rents does *not* have an interest in rents superior to that of a creditor who has enforced a later-recorded assignment, so long as the senior assignee has not enforced its prior-filed assignment. *Exchange Nat'l Bank v. Gotta (In re Gotta),* 47 B.R. 198, 202 (Bktcy.W. D.Wis.1985). Once the prior-recorded assign-

a first interest in rents by prepetition recording of its assignment of rents, that interest extends to postpetition rents as well. 11 U.S.C. § 552(b). TCF recorded the mortgage containing the assignment of rents on August 19, 1986, prior to the filing of debtor's petition, and therefore the rents generated by debtor's property are cash collateral.

 The parties' briefs reveal they are in relative agreement as to the conditions that must be imposed on the use of the cash collateral in order to adequately protect TCF's interest. Both parties agree that debtor must segregate the rents; make timely payment of all current operating expenses, including but not limited to Tycon's management fee, insurance, and real estate taxes; and pay past-due real estate taxes. TCF does not object to the use of its cash collateral to pay these expenses so long as the above conditions are met. TCF is correct that if the rents were inadequate to pay these expenses, its interest would not be adequately protected. According to debtor's credible projections, however, the rents will be adequate. It is appropriate to allow debtor to use TCF's cash collateral pursuant to the restrictions outlined in this Order. *See In re Franklin Pembroke Venture II,* 105 B.R. 276, 280–81 (Bktcy.E.D.Pa.1989).

ACCORDINGLY, IT IS HEREBY ORDERED:

1. TCF's motion to dismiss or convert is denied without prejudice to renew as set forth in Paragraph 3 of this Order.

2. TCF's motion for relief from the automatic stay is denied without prejudice to renew as set forth in Paragraph 3 of this Order.

3. Debtor shall file a plan and disclosure statement no later than February 1, 1990. If debtor fails to do so, TCF may renew its motions. The Court will decide such renewed motions on the papers as filed in connection with these pending motions, and such supplemental materials as the parties may wish to submit.

4. The debtor has leave to use TCF's cash collateral in the form of rents subject to the following terms and conditions:

a. Debtor shall use such rents to pay normal operating expenses including but not limited to the current management fee to Tycon Management, Inc., the currently accruing real estate taxes, all insurance payments, and past-due real estate taxes. With the approval of TCF, debtor may also use such rents to make projected repairs, to attend to expected maintenance items on which evidence was presented at the hearing or any other maintenance item TCF elects to pre-authorize.

b. Should TCF demand it in writing, debtor shall establish an escrow account for the purpose of prefunding anticipated real estate taxes and insurance.

c. All rents shall be deposited in the account of debtor in possession or in the separate escrow account. No withdrawals from such accounts shall be made to pay items, other than those designated in subparagraphs a and b, without the permission of TCF. Specifically, no withdrawals shall be made from the account to make distributions to the partners or, until further order of this Court, to pay attorneys fees to counsel for the debtor. No payments of principal and interest on the indebtedness to TCF need be made. No payments of principal and interest on the junior secured indebtedness shall be made without the consent of TCF and an order of this Court.

d. Should the rents be insufficient to pay in timely fashion the items of expense listed in subparagraphs a and b above, TCF may immediately renew its opposition to the debtor's use of cash collateral.

ment is enforced, the senior assignee is entitled to rents going forward, but cannot recover rents previously received by the junior assignee as a result of the latter's prior enforcement.
*United Fed. Sav. Bank,* 108 B.R. at 695 n.6. Consistent with that body of law, rents subject to an assignment of rents would not constitute cash collateral until the assignment was enforced. I feel compelled, however, to follow the contrary precedent now established in this district, with which I respectfully continue to disagree.

e. Debtor shall furnish TCF with monthly operating statements with respect to the Marion Street Partnership property and shall allow TCF access to the books and records of the partnership (at reasonable times and with reasonable notice) for the purpose of verifying their accuracy. Failure to furnish such reports within 15 days after each month's end shall be cause for allowance of TCF to renew its opposition to the use of cash collateral. Debtor shall also furnish proof of the establishment of an escrow account if TCF requests such establishment.

5. If either party desires to have the Court modify the conditions herein or impose additional conditions on the use of TCF's cash collateral, it shall have 7 days from the date of this Order to file with the Court a written request to that effect.