## In re MILL PLACE LIMITED PARTNERSHIP, Debtor.

### Bankruptcy No. 3–88–3044.

United States Bankruptcy Court,
D. Minnesota,
Third Division.

Dec. 2, 1988.

Joseph Alexander, Virginia Bell, Minneapolis, Minn., for Mill Place.

John Thomas, Mathew Fitzmaurice, Minneapolis, Minn., for Prudential.

Amy Kobuchar, Minneapolis, Minn., for Alan Wilensky.

## ORDER

DENNIS D. O'BRIEN, Bankruptcy Judge.

At St. Paul, Minnesota.

The above-entitled matter came on for hearing on November 17, 1988, on motion by Prudential Insurance Company of America (Prudential) to dismiss this bankruptcy case for bad-faith filing, and on motions by Debtor for expanded use of cash collateral and for the approval of appointment of certain professionals. Based on the testimony and documentary evidence heard and received, and upon memoranda and arguments of counsel, the Court now being fully advised in the matter hereby makes this Order pursuant to the Federal and Local Rules of Bankruptcy Procedure.

### I.

Mill Place Limited Partnership (Mill Place) is a limited partnership that filed for relief under 11 U.S.C. Chapter 11 on September 28, 1988. Mill Place's general partner commenced the case as a defense to state court proceedings brought by Prudential for the appointment of a receiver coincident with foreclosure of its nonrecourse mortgage on the Debtor's principal asset. Prudential countered with a motion to dismiss for bad-faith filing.

According to Mill Place's schedules, the Debtor has three secured creditors. They are: Prudential, with a $7,000,000.00 mortgage on Mill Place, a Minneapolis riverfront restoration development office building; GT Finance with a $12,800.00 lien on heating equipment in the building; and Ben Miller, a limited partner with a $125,000.00 mortgage on a parcel of real estate adjacent to Mill Place which is used as a parking lot.

The schedules list 14 unsecured creditors totalling $26,100.00. Six of them are shown as having claims of less than $100.00. One creditor is not assigned any value to its claim. Of the remaining seven creditors, two claims are shown exceeding $5,000.00. The debts owing all unsecured creditors listed were incurred prepetition

for maintenance performed on, or services rendered to, Mill Place.

The Debtor's scheduled assets consist of two parcels of real estate and $60,900.00 in cash. One real estate parcel is the Mill Place commercial building and land upon which it sits, valued by the Debtor at $3,500,000.00. It is subject to Prudential's $7,000,000.00 mortgage. The other is an adjacent oddly shaped parcel, historically used for railroad purposes, now utilized by Mill Place as a parking lot for the commercial building. The second parcel is valued by the Debtor in excess of $500,000.00 and is subject to Ben Miller's $125,000.00 mortgage. The cash is rent receipts and is Prudential's cash collateral by prepetition rent assignment.

Alan Wilensky is a limited partner who directly and indirectly has a substantial partnership interest in Mill Place. He is also an attorney who attempted to negotiate a financial workout with Prudential on behalf of the partnership prior to the filing of the petition. Prudential's mortgage had been in default for about a year before bankruptcy.

One of the more attractive features of the limited partnership interests (perhaps the only one) has been the availability to the partners of certain tax deductions to offset nonpartnership income. The Mill Place project development is an officially designated historic restoration project to which special tax treatment applies as an incentive to attract investors. To maximize the tax advantage, and possibly to avoid recapture of deductions previously taken, the partners must retain their interests until June of 1990. Mr. Wilensky had explored various alternatives with Prudential, prepetition, toward that end.

When Wilensky ran out of ideas and Prudential ran out of patience, the war began. The first salvos were verbal. Prudential warned of an immediate assault through foreclosure. Wilensky countered with the thunderous threat of a "scorched earth" retreat and defense that would involve Chapter 11 and that would prove extremely costly to Prudential. Only the lawyers, he claimed, would benefit from

such a war. Prudential took steps to foreclose, and Mill Place filed its petition.

Prudential argues that the petition was filed in bad faith, and furthermore, that confirmation of a plan under any scenario is impossible over its objection. The case should therefore be dismissed, it claims.

The Debtor counters that the only dismissal should be Wilensky's prepetition threats to employ "scorched earth" tactics in defense to foreclosure. The Debtor argues: the threat was merely a thunderous charge that fired a blank; and it should be dismissed as simply zealous representation in the heat of negotiation. The petition was filed in good faith, the Debtor argues, and Mill Place points to new management along with an aggressive post-petition attempt at obtaining fresh capital as evidence.

## II.

Dismissal of a Chapter 11 bankruptcy case for bad-faith filing is a power that should be exercised with extreme caution. Ordinarily, to justify such a dismissal, there should exist circumstances other than alleged hopeless financial condition of a debtor. Otherwise, Chapter 11 will likely become a protection and remedy easily available only to those who need it the least, while those who need it the most will be left to essentially prove good faith in order to qualify.

Creditors who become entangled in hopeless Chapter 11 cases filed by debtors have remedies of relief from stay, adequate protection, and dismissal or conversion based on the enumerated grounds in 11 U.S.C. § 1112(b). Dismissal on grounds of bad-faith filing should not be judicially developed as an easy alternative to other post-petition creditor remedies, thereby, subverting the reorganization and confirmation scheme of the Code.

 Dismissal for bad-faith filing should ordinarily be restricted to those instances where it can be clearly and convincingly shown that a debtor filed either to maliciously injure, damage or destroy the property rights of another; or to accom-

plish an otherwise unlawful purpose through use of the Bankruptcy Code. Filing a petition on the eve of foreclosure, or to stop a foreclosure in progress, is not, standing alone, bad-faith conduct. Nor is it bad-faith conduct for a debtor to file on the eve of foreclosure with what then appears to be an unrealistic hope of the ability to reorganize.

■ The exercise of a right or remedy does not ordinarily constitute the malicious injury, damage or destruction of the property rights of another, even though some injury to such property might result in the process. Furthermore, the observation, boast or threat of likely injury is not clear and convincing evidence of a bad-faith Chapter 11 filing when reorganization is realistically possible over the objection of hostile creditors, within a reasonable period of time after filing.

However, use of Chapter 11 of the Bankruptcy Code for the sole purpose of delaying or injuring a threatened creditor is both malicious and for an unlawful purpose. It is an abuse of process—the unlawful exercise of a right or remedy. Where it is apparent that successful reorganization is either legally impossible or highly unlikely over the objection of a threatened creditor; that circumstance, along with prepetition threats made by a debtor to delay or injure the creditor through the filing and prosecution of Chapter 11 proceedings, can present clear and convincing evidence of bad-faith filing. The evidence in this case is clear and convincing that the Debtor filed its Chapter 11 petition in bad faith.

■ While successful reorganization is not impossible for the Debtor, rehabilitation is highly unlikely without the cooperation of Prudential. The Debtor has been seeking a solution to its severe financial difficulties for at least one year prior to filing and has been unsuccessful. It recognizes that there is no solution short of a massive infusion of capital which thus far it has been unable to obtain. Although the Debtor has been confronted with its finan-

cial difficulties for a substantial time prior to filing, it could offer nothing at hearing other than the vague hope of finding "white knight" investors somewhere to rescue it.

But even if a substantial infusion of capital could be made available, the ability to confirm a plan without the support of Prudential is doubtful. Such a plan would require provision for payment of Prudential's secured and unsecured claims in full on or before the effective date of confirmation, or complete cure and reinstatement of its contract. This case essentially presents a two-party dispute.

Section 1129(a)(10) requires that, if there is an impaired class of claims, then at least one class of impaired claims (other than an insider class) must vote to accept the plan. Aside from insider implications of Ben Miller's claim, it is de minimis. The Debtor was not in default on the claim at filing, the default is minimal, and there exists no apparent justification for a good-faith plan to leave it impaired.[1] The same is true of GT Finance's secured claim in the amount of $12,800.00.

Prudential's unsecured claim would obviously control the unsecured class, if it be included in addition to the scheduled $26,-100.00. But if the scheduled unsecured creditors be treated as a separate class, that class too would be de minimis. There would exist no apparent justification for a good-faith plan to leave it impaired either.

Consequently, under circumstances of the case, the only impaired classes that would be available in a good-faith plan to satisfy the requirements of § 1129(a)(10) are represented by Prudential's secured and unsecured claims. As long as those classes remain impaired, § 1129(a)(10) cannot be satisfied without Prudential's affirmative vote. The only way, then, that § 1129(a)(10) could be satisfied without Prudential's cooperation would be for a plan to leave no classes of claims impaired. That, of course, would require payment of

1. The note and mortgage require period payment of interest only on the obligation. Miller was not even aware of the default until it was

pointed out to him by the Debtor prior to hearing on the motion to dismiss the case.

Prudential's secured and unsecured claims in full on or before the effective date of the plan; or, complete cure and reinstatement of the contract terms. *See* 11 U.S.C. § 1124.

Even if a plan could be devised that would satisfy § 1129(a)(10) without the immediate payment in full to Prudential or reinstatement of its contract, it is highly unlikely that a plan which would pay Prudential less than full value of its claims with interest over time, could be confirmed without Prudential's consent. Section 1129(b)(2)(A) clearly requires such treatment with respect to the allowed amount of Prudential's secured claim.

Section 1129(b)(2)(B) would likely require similar treatment of the allowed amount of Prudential's unsecured claim. That section provides:

> (2) For purposes of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
>
> . . . . .
>
> (B) With respect to a class of unsecured claims—
>
> (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
>
> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

In a two-party dispute, the new owner alternative to full payment, provided for in § 1129(b)(2)(B)(ii), would be insufficient to satisfy the fair and equitable test, since the only beneficiaries of its application would be post-confirmation third-party interests of new investors. The concept of cramdown is premised upon the equity of balancing the rights of disagreeing classes of creditors against one another. The concept has never involved the compromise or modification of creditors' rights for the post-confirmation benefit of new investors.

In this two-party dispute, confirmation is extremely unlikely without the cooperation of Prudential. Other creditors have de minimis claims, and, in any event, are likely to be fully paid. The other small secured claims appear to be fully secured, and virtually all of the scheduled unsecured debt is for materials furnished or services rendered to Mill Place. As a practical matter, these claims will likely be paid regardless of who ultimately obtains possession, ownership and control of the property.

The Debtor has had at least one year prior to filing to work out its financial difficulties with Prudential, and has been unsuccessful. It claims that it now has new management and is poised to aggressively seek new investors. In fact, the only resource that the Debtor has available to fund a reorganization effort of any kind, is Prudential's cash collateral. Prudential is undersecured and objects to the use of its cash collateral for any purpose other than ordinary and necessary expenses to maintain its real estate collateral during pendency of the case. There exists no legal or equitable basis for allowing a debtor to use an undersecured creditor's cash collateral over its objection to fund a reorganization effort through activities and expenditures that are outside the ordinary course of business.

The debt owing to Prudential is nonrecourse. The individual partners have no personal liability to Prudential, and their only interest at stake in the case is the potential tax shelter value of their partnership shares. The Debtor's ownership of Mill Place is essentially a passive investment. The partnership has few, if any, regular employees. There really is no business, as such, at stake in any reorganization. Mill Place will continue to exist with or without the Debtor. In fact, Prudential has the only substantial, tangible interest at stake in the case, and it remains an unwilling participant.

The case is clearly inappropriate for Chapter 11 and should be dismissed as a bad-faith filing.

Based on the foregoing,

IT IS HEREBY ORDERED:

1. Prudential Insurance Company's motion to dismiss this bankruptcy case is granted.

2. The pending motions and applications by the Debtor are denied as moot.

3. This case shall be and hereby is dismissed with prejudice.