**In re LUMBER EXCHANGE LIMITED PARTNERSHIP, a Minnesota limited partnership, Debtor.**

**Bankruptcy No. 3–90–5226.**

United States Bankruptcy Court,
D. Minnesota,
Third Division.

March 18, 1991.

Michael L. Meyer, Mpls., Minn., for debtor.

Kim Anderson, Mpls., Minn., for Mutual Life Insurance of New York.

## ORDER

DENNIS D. O'BRIEN, Bankruptcy Judge.

This matter came on for evidentiary hearing January 22, 1991, on motion by Mutual Life Insurance Company of New York (MONY) alternatively for dismissal of the case or relief from stay. Following the presentation of evidence, supplemental briefs were filed, and the issues were orally argued at continued hearing on February 22, 1991. Appearances are as noted in the record. The Court, having before it all relevant evidence, having considered the briefs and oral arguments of the parties, and being fully advised in the matter, now makes this ORDER pursuant to the Federal and Local Rules of Bankruptcy Procedure.

## I.

### FACTS

Lumber Exchange Building Limited Partnership (Lumber Exchange or the Debtor) was formed in 1984 to acquire, complete renovation of, and to own as an investment, the Lumber Exchange Building located in Minneapolis, Minnesota. The Debtor has no employees. Its two general partners are individuals, Gary O. Benson and Robert M. Mecay, who together hold 66⅔% interest in the Lumber Exchange. The Debtor's sole-limited partner, holding the remaining 33⅓%, is another limited partnership, known as Lumber Exchange Investors Limited Partnership (Investors). Benson and Mecay are the general partners of, and together hold 1% of the interest in, that entity. The limited partners of Investors are 56 individuals who hold 99% of the total partnership interest.

MONY is the Debtor's major creditor, and was owed $20,877,504.64 at filing of the case. The debt is the result of a nonrecourse refinancing loan and is secured through a real estate mortgage and security agreement on the Lumber Exchange Building, and by an assignment of leases and rents. The Debtor values the property at $7,000,000. If the valuation is correct, MONY is undersecured in the amount of $13,877,504.64.[1] Other claims are:

| | |
|---|---|
| Hennepin County, real estate taxes | $415,458.99 |
| Midway National Bank, secured | $125,048.00 |
| Minneapolis Water Works, secured | $ 37,952.00 |
| Unsecured trade creditors | $207,300.00 |
| Unsecured insider (Twin Town Realty)[2] | $245,700.00 |

The MONY loan was closed in September 1987 and first went into default in February 1989. The parties entered into a forbearance agreement in June 1989, which provided the Debtor a period of ten months to cure the defaults. At the end of the period, the Debtor was unable to resume full performance and, in June 1990, MONY commenced mortgage foreclosure proceedings. The Debtor filed its voluntary petition for relief under Chapter 11 of the *United States Bankruptcy Code*, 11 U.S.C. § 101 *et seq.*, on November 7, 1990, one day prior to a scheduled hearing in a state district court concerning the appointment of a receiver in foreclosure.

MONY filed its motion for dismissal or relief from stay on December 6, 1990. The motion for dismissal is based on alleged bad-faith filing of the case, while the motion for relief from stay is based on alleged legal inability of the Debtor to obtain confirmation of a plan over MONY's objection. In response, the Debtor offered a model plan at the evidentiary hearing and filed a proposed plan on the day the issues were orally argued. The proposed plan generally treats the various claims in this manner:

*Unclassified.* Hennepin County.

*Class A.* Midway National Bank, unimpaired in the amount of $125,048.

*Class B.* Minneapolis Waterworks, impaired with fully secured 36 month term note in the amount of $37,952.

*Class C–1.* MONY, impaired, with secured 10–year term note in the amount of $7,000,000.

1. In its schedules filed with the petition, the Debtor valued the building at $13,000,000. However, at the hearing on MONY's motion, the Lumber Exchange offered valuation evidence fixing the value at $7,000,000. The Debtor's proposed plan, filed on February 22, 1991, is premised on the lower value.

2. The real estate taxes and Water Works liens are ahead of MONY's mortgage and would further reduce the value of its lien by those amounts. Midway National Bank is secured by proceeds from certain successful tax litigation. Twin Town Realty, an affiliate of the Debtor owned by Benson and Mecay, is the leasing agent of the Debtor. A wholly owned subsidiary of that entity, Lumber Exchange Management Company, operates the Lumber Exchange Building.

*Class C–2.* MONY, impaired unsecured claim in the amount of $13,877,504.64, to be satisfied: in part, through a pro rata payment, on the effective date of the plan, from a $200,000 distribution fund to be shared with Class D; and, in part through the right to receive certain specified payments upon a later sale of the property or distribution to partners.

*Class D.* All other allowed unsecured claims to be satisfied through a pro rata payment, on the effective date of the plan, from the $200,000 distribution fund to be shared with Class C–2.

*Class E.* All pre-petition partnership interests in the Debtor, including those held by reason of the ownership of an interest in Investors. Holders to be given the right to invest new capital. Holders who do not invest would lose their interests. Those who do invest would have their interests adjusted based on the ratio of their contribution to the total new investment.

The Debtor offered testimony at the initial hearing that $800,000 in new capital would be required to fund the plan and ongoing operations. Of that amount, $200,000 would be placed in the distribution fund, and $600,000 would be used for certain building changes, improvements, and for other tenant targeted incentives designed to enhance marketability of leases.

## II.

### ISSUES

1. Should the case be dismissed as a bad-faith filing?

2. Is MONY entitled to relief from stay under 11 U.S.C. § 362(d)(2) to continue foreclosure of its interest in the Lumber Exchange property, on the grounds that the Debtor has no equity in the property and that the property is not necessary to an effective reorganization?

3. If MONY is entitled to relief from stay under 11 U.S.C. § 362(d)(2), should the case be dismissed under 11 U.S.C. § 1112(b)(2) for inability to effectuate a plan?

## III.

### DISCUSSION

*Should The Case Be Dismissed As A Bad-Faith Filing?*

■ MONY argues that the case should be dismissed as having been filed in bad faith. According to MONY, the following factors are to be considered in determining whether a debtor has filed a Chapter 11 case in bad faith:

(a) Whether the case involves a single asset;

(b) Whether there is a small number of unsecured creditors whose claims are small in relation to the claims of secured creditors;

(c) Whether the debtor has a small number of employees;

(d) Whether the debtor's financial problems involve essentially a dispute between the debtor and the secured creditors which can be resolved via state court actions; and

(e) Whether the filing was made on the eve of a state court foreclosure proceeding.

MONY cites *In re Marion Street Partnership,* 108 B.R. 218, 222 (Bankr.D.Minn. 1989), *citing: Phoenix Piccadilly v. Life Ins. Co. (In re Phoenix Piccadilly,* 849 F.2d 1393, 1394–95 (11th Cir.1988)), for this proposition. In light of the facts of this case, MONY argues, all of the factors indicate bad faith.

■ A fair reading of *Marion Street Partnership* is that the Bankruptcy Court simply observed that the 11th Circuit had provided a "... partial laundry list of factors to be considered," but that the real focus should be to "look to the totality of the circumstances and scrutinize the evidence to determine ... whether the debtor entered the bankruptcy process with any real intention to reorganize rather than stall." *See: Marion Street Partnership,* 108 B.R. 218, 222–223. Interestingly, the facts of that case were not favorable to the debtor in light of the listed factors, yet the Court declined to dismiss for bad-faith fil-

ing.[3] Certainly, no holding in the case provides any apparent basis for dismissing this case on grounds of bad-faith filing.

MONY argues that dismissal for bad faith is appropriate where the sole purpose of the filing is to prevent the exercise by a creditor of its contractual remedies; the case essentially involves a two-party dispute between the debtor and the creditor; and, where rehabilitation is unlikely without the cooperation of the creditor, *citing: In re Mill Place Limited Partnership,* 94 B.R. 139 (Bankr.D.Minn.1988). Dismissal for bad-faith filing on the authority of *Mill Place,* would result in an overly broad and sweeping application of its holding.

Actually, *Mill Place* recognizes only a very small bad-faith filing window through which a case should be thrown out of Chapter 11. The Court plainly stated that:

> Dismissal for bad-faith filing should ordinarily be restricted to those instances where it can be clearly and convincingly shown that a debtor filed *either to maliciously injure, damage or destroy the property rights of another; or to accomplish an otherwise unlawful purpose through use of the Bankruptcy Code.* (emphasis added).

*Mill Place,* 94 B.R. 139, 141, 142. The fact that the debtor in that case lacked the ability to reorganize was not determinative of the issue of bad faith. Indeed the Court quite clearly stated that:

> Creditors who become entangled in hopeless Chapter 11 cases filed by debtors have remedies of relief from stay, adequate protection, and dismissal or conversion based on the enumerated grounds in 11 U.S.C. § 1112(b). Dismissal on grounds of bad-faith filing should not be judicially developed as an easy alternative to other post-petition creditor

> remedies, thereby, subverting the reorganization and confirmation scheme of the Code.

*Mill Place,* at 141.

In *Mill Place,* the hopeless condition of the debtor was only part of the determinative evidence. Extrinsic evidence of bad faith was the other part. The Court found, based on testimony taken in the case, that the threat against the major creditor of the debtor by the debtor's principal, who was also a lawyer, to file the case as part of a "scorched earth" policy against the creditor, was a "smoking gun" on the issue of bad faith in light of the debtor's apparent objective inability to reorganize. Accordingly, the Court stated:

> [U]se of Chapter 11 of the Bankruptcy Code for the sole purpose of delaying or injuring a threatened creditor is both malicious and for an unlawful purpose.... Where it is apparent that successful reorganization is either legally impossible or highly unlikely *over the objection of a threatened creditor;* that circumstance, *along with prepetition threats made by a debtor to delay or injure the creditor through the filing and prosecution of Chapter 11 proceedings, can present clear and convincing evidence of bad-faith filing.* (emphasis added).

*Mill Place,* 94 B.R. at 142. The case does not support dismissal for bad faith here. No extrinsic evidence of bad faith is of record in this case.

Finally, MONY relies generally on the case of *Stage I Land Co. v. U.S. Dept. of Housing and Urban Dev.,* 71 B.R. 225 (D.Minn.1986) in its argument that the case should be dismissed for bad-faith filing. However, the *Stage I* holding arose out of unique facts.[4] No reported opinion in the

---

**3.** The debtor in the case was a single-asset partnership, owning an apartment complex with scheduled mortgages against it in the amount of $5,000,000. The property had a value of no more than $4,000,000. Scheduled unsecured debt totalled less than $20,000. The partnership was syndicated for the purpose of throwing off tax losses, without the intention to operate the project with a positive cash flow. The debtor had approximately 16 employees as caretakers,

managers and similar types, some of whom received rent credits in lieu of salary.

**4.** Stage I was a partnership formed to own what was then the largest housing project in Minnesota. The project involved the Department of Housing and Urban Development, which took an assignment of loans following default to the original lenders. The loans were in the total amount of $30,556,600 and were insured by HUD. The project was in default from its inception. By the time a petition was filed under

district has cited *Stage I* as authority for dismissing a Chapter 11 case for bad-faith filing.

There is neither persuasive evidence nor persuasive authority for dismissal of this case for bad-faith filing. No extrinsic evidence of bad faith has been offered. Contrary to MONY's assertion, both *In re Marion Street Partnership*, 108 B.R. 218, 222 (Bankr.D.Minn.1989), and *In re Mill Place Limited Partnership*, 94 B.R. 139 (Bankr.D.Minn.1988), suggest that dismissal of this case for bad-faith filing would be inappropriate.

*Is MONY Entitled To Relief From Stay?*

MONY argues that it is entitled to relief from stay under 11 U.S.C. § 362(d)(2) because the Debtor has no equity in the property and the property is not necessary to an effective reorganization. MONY asserts that the Debtor cannot obtain confirmation of any plan over its objection, and that it would consent only to a plan that would pay its claims in full or surrender the property. *Citing Anderson v. Farm Credit Bank*, 913 F.2d 530 (8th Cir.1990) [5], MONY claims that no reorganization is possible, and that it is entitled to relief from stay pursuant to the statute. The Debtor disagrees.

The dispute focuses on 11 U.S.C. §§ 1129(a)(10) and 1129(b)(2)(B). MONY argues that the Debtor may not separately classify its undersecured claim from the claims of unsecured trade creditors, and that absent the separate classification, there is no impaired class that would accept the plan, as required by 11 U.S.C. § 1129(a)(10).[6] Furthermore, MONY claims, rejection of the proposed plan by its Class C–2 claim would trigger the absolute priority provisions of § 1129(b)(2)(B), which would prohibit confirmation.

The Debtor argues that it can separately classify the undersecured claim of MONY, and that the separate classification of the claim in its plan is proper. Regarding the application of § 1129(b)(2)(B), the Debtor asserts that the "new contribution" provisions of the plan provide an exception to the absolute priority provisions of the *Bankruptcy Code*, under which the plan can be confirmed over the objection of the rejecting undersecured class.

*Separate classification of MONY's undersecured claim and application of § 1129(a)(10).*

■ 11 U.S.C. § 1122 provides for the classification of claims and interests in a Chapter 11 case.[7] The law in the Eighth

---

Chapter 11, the defaults had continued and grew for more than ten years through at least six attempted workout agreements. Upon filing, the debt owed HUD was nearly $40,000,000, secured by property valued at no more than $20,000,000. Furthermore, the property was subject to a final decree of foreclosure entered by the federal district court, which had also directed that sale of the property be held following a short redemption period. The Bankruptcy Court dismissed the case on the theory that the mortgage had been finally foreclosed under federal law by the issuance of the district court decree, and that at filing the only interest remaining in the debtor was a right of redemption, which was not a reorganizable interest. The district court affirmed the dismissal, but on grounds of bad faith filing in light of the long, protracted and difficult financial history of the debtor, and the numerous prepetition workout attempts.

5. The Circuit Court, in *Anderson v. Farm Credit Bank,* ruled that a debtor who defends a § 362(d)(2) motion on grounds that the property involved is necessary to an effective reorganization, has the burden of showing that there is: "a reasonable possibility of a successful reorga-

nization within a reasonable time." *Anderson,* 913 F.2d 530, 532, *quoting* and *citing: United Savings Assn. v. Timbers,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

6. Mony asserts that its mortgage and security documents provide that it has the right to pay the delinquency to Minneapolis Water Works and add the amount to its claim. The water charges constitute a lien on the property ahead of Mony's mortgage and security interests. The Debtor does not dispute the assertion.

7. 11 U.S.C. § 1122 reads:
(a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.
(b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

Circuit is that § 1122(a) does not prohibit the placement of substantially similar claims in the different classes. *See: Hanson v. First Bank of South Dakota,* 828 F.2d 1310 (8th Cir.1987). Separate classification, however, cannot be made: for the purpose of securing an accepting class to meet the requirements of § 1129(a)(10); or, solely on the distinction between unsecured trade creditors and unsecured creditors who are also partially secured. *See: Hanson,* 828 F.2d at 1313.

■ The only apparent reason, other than to manipulate class voting, for placing similar claims in different classes, is to treat them differently. The Debtor proposes to do so in this case, it argues, because more favorable treatment is necessary for MONY in order for the Debtor to meet the fair and equitable test applicable to 11 U.S.C. § 1129(b)(2)(B).[8] The argument is not persuasive.

MONY, the targeted class, does not want more favorable treatment and has made it abundantly clear that it will not willingly accept it. Furthermore, there is no apparent reason why the same enhanced treatment, through additional future potential payment, should not be afforded the unsecured trade creditors along with Mony in the same class. Clearly, the total amount of trade debt is *de minimis* in relation to the overall debt of the Debtor, and provision for the trade creditors to a share in any potential future payment would not inconvenience the transaction, much less render it unworkable. The separate classification of MONY's undersecured claim is a thinly veiled attempt to manipulate the vote to assure acceptance of the plan by an impaired class and meet the requirement of 11 U.S.C. § 1129(a)(10).[9]

*Equity security holders' "new contribution" and the absolute priority provisions of § 1129(b)(2)(B).*

■ Under the *Bankruptcy Act,* a plan could be confirmed only if it was "fair and equitable" *to each dissenting creditor. See:* Section 221 of Chapter X of the *Bankruptcy Act,* former 11 U.S.C. § 621 (1978)

---

**8.** Lumber Exchange did not clearly articulate why MONY had to be afforded more favorable treatment than its trade creditors in order for the plan to meet the fair and equitable test in § 1129(b)(2)(B), but the assertion is somewhat ironic in light of the argument it makes and the authority it cites in support of separate classification. The Debtor relies heavily on the case of *In re Greystone III Joint Venture,* 102 B.R. 560 (Bankr.W.D.Texas 1989) *aff'd, Phoenix Mutual Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture),* 127 B.R. 138 (W.D. Tex.1990). In stating its case for separate classification, the Debtor argues:

> [T]he court in *Greystone* concluded that good business reasons justify separate treatment. Trade creditors simply do not extend credit to an entity based on that entity's long-term ability to repay the debt. Instead, they base it on the entity's short-term cash flow. If those expectations are frustrated, the trade creditors have little recourse but to refrain from doing business with the entity. The resulting negative reputation quickly spreads to other trade creditors making it virtually impossible to obtain services in the future on anything but a cash basis. Such "simple realities of business more than justify separate classification of the trade debt from the obviously unrelated code-created deficiency claim." *Greystone,* 102 B.R. at 570.

*Debtors Verified Memorandum,* Jan. 18 1991, at 28.

**9.** Appropriate separate classification of unsecured claims in this case might have been a scheme creating three classes: one for trade creditors, which would be paid in full; one for Mony, with provisions substantially the same as proposed by the Debtor; and, one for the unsecured claims of insiders, which would be subordinated to the others. *Compare with: In re 11,111, Inc.,* 117 B.R. 471 (Bankr.D.Minn.1990). Indeed, the argument made by the Debtor in justification for separately classifying Mony for special treatment is more properly made in support of separately classifying the trade creditors for more favorable treatment. *See: footnote 8.* Curiously, the *Greystone* court, after justifying separate classification of the trade creditors in that case because of what it found to be the special nature of their claims and their special needs, stated that a plan which would pay them differently than the undersecured claim of the objecting creditor would unfairly discriminate against the latter. *See: Greystone,* at 572. Accordingly, in that case, the court allowed separate classification of the trade claims, and went on to cram down a plan on the major creditor, Phoenix Mutual, whose undersecured claim alone was $3,475,000, for the benefit of the trade class, whose claims totaled $10,000, and which apparently received a total class payment of just over 3%, or slightly more than $300. *See: Greystone,* at 561.

(repealed). Generally, a plan was fair and equitable only if it recognized and treated claims and interests in the order of their priorities under applicable non-bankruptcy law. Accordingly, equity holders were not generally entitled to participate in a reorganized debtor over the dissent of creditors whose claims were not paid in full. *See: Case v. Los Angeles Lumber Co.*, 308 U.S. 106, 114, 116, 60 S.Ct. 1, 6–7, 7–8, 84 L.Ed. 110 (1939).

There were, however, limited judicially developed exceptions to this "absolute priority rule." The Supreme Court, in *Case,* for instance, indicated that an equity interest might be retained even though dissenting creditors were not fully paid where, in exchange for retaining the interest, a necessary and substantial cash contribution is made under the plan by the junior interest. *See: Case,* 308 U.S. 106, 121, 60 S.Ct. 1, 10.

The Debtor argues that this "new value" exception to the "absolute priority rule" recognized in *Case,* survives under the *Bankruptcy Code of 1978.* MONY argues that it does not.

The *Bankruptcy Code* refocused the concept "fair and equitable" away from dissenting *creditors* and onto dissenting *classes.* 11 U.S.C. § 1129(b)(1) provides for confirmation of a plan that is rejected by an impaired class: if the plan does not discriminate unfairly; and, if it is fair and equitable *to each dissenting class* of claims or interests that is impaired under the plan. Section 1129(b)(2)(B) provides that, with respect to a rejecting class of unsecured claims, the condition of fair and equitable include these requirements:

(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan,

equal to the allowed amount of such claim; or

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

Application of absolute priority rule exceptions to creditor members of a *rejecting* class was never discussed in cases decided under the *Bankruptcy Act.* In fact, the required finding of fair and equitable was applicable only to the dissenting minority creditors belonging to an *accepting* class.

Class acceptance by requisite percentage approval, and a finding of "fair and equitable" regarding minority dissenting creditors of the same class, were both required to obtain confirmation under the *Bankruptcy Act. See: Case,* 106 U.S. at 114, 60 S.Ct. at 6. Accordingly, the absolute priority rule was not applicable to a rejecting class. Class acceptance was a condition precedent to application of the rule.

If 11 U.S.C. § 1129(b)(1) stood alone, it would be appropriate, if not necessary, to judicially determine whether the scope of the measure "fair and equitable", to be applied to a rejecting class under the *Code,* includes the "new value" exception to the absolute priority rule applied under the *Bankruptcy Act* by the courts to the claims of minority dissenters of a particular accepting class.[10] However, such a determination is unnecessary, and would be inappropriate, because § 1129(b)(2) legislatively prescribes what the "fair and equitable" standard minimally includes under the Bankruptcy *Code* in order for a plan to be confirmed over the objection of a class.

---

**10.** In the absence of statutory definition, the words "fair and equitable" are words of art with fixed meaning through judicial interpretations, which when employed in an act at a time when the meaning is well known, would be used in that known sense unless the context requires otherwise. *See: Case v. Los Angeles Lumber,* 106 U.S. 106, 115, 60 S.Ct. 1, 7, 84 L.Ed. 110 (1939). However, it is by no means certain that the "new value" exception to absolute priority, when considered with respect to a rejecting

*class* under the *Code,* would measure the same equitable strength as when applied to *individual dissenters* of an accepting class under the *Bankruptcy Act.* Indeed, under the *Act* the exception was only applied to minority creditors after the majority of the same class had waived its rights to absolute priority by accepting the plan. As used under the *Act,* the exception did not collide with the absolute priority rights of the *class.* Application of the exception under the *Code* would eviscerate those rights.

■ With respect to a rejecting unsecured class, the standard requires that each member of the class be paid in full, or, that the holders in junior classes receive no property on account of their claims and interests. *See:* 11 U.S.C. § 1129(b)(2)(B). This is simply a codification of the absolute priority rule, without its exceptions.

The unsecured creditors' committee argues, in support of the Debtor, that reference to the contribution of new value as an "exception" to the absolute priority rule, especially in the context of the priority provisions of 11 U.S.C. § 1129(b)(2)(B), is a mischaracterization of the concept. The committee argues that no property is retained *on account of* junior claims or interests in connection with new cash contributions by equity security holders. New equity holder interests are acquired *on account of* the new contributions, it asserts. The committee argues that qualifying language in the statute limiting the prohibited receipt of property to that received "on account of such junior claim or interest" recognizes the right of junior holders to acquire new interests through new contributions. The argument is not persuasive.

The statutory language focused on by the committee simply recognizes that those holders of junior claims or interests, who are also holders of claims or interests equal or senior to the rejecting unsecured class, can retain or receive property on account of their equal or senior claims or interests under a plan without the plan violating the priority provisions of the *Code.* A special opportunity or right afforded to members of a class of equity security holders to retain or acquire an equity position in a reorganized debtor through a new cash contribution under a plan is, by its very nature, the opportunity or right to receive or retain property on account of the prepetition interest held. When the opportunity is fulfilled, or the right exercised, clearly, the interest is retained or received *on ac-*

*count of* the prior interest, even though new consideration is paid in the transaction.

The "new value" exception to the absolute priority rule developed by the courts as part of the fair and equitable test applied to minority dissenting creditors of an accepting class under the *Bankruptcy Act,* has no application to a rejecting class under 11 U.S.C. § 1129(b)(2)(B). The *Code* does not allow confirmation of a plan over the objection of an unsecured class where the plan affords equity security holders of a debtor a special right to retain or acquire an equity interest in the reorganized debtor through a cash contribution.

■ But even if the exception applied, or the *Code* otherwise accommodated the concept of new cash contribution, the plan proposed by the Debtor could not be confirmed as fair and equitable to the rejecting class in this case. The statutory requirements of fair and equitable detailed in 11 U.S.C. § 1129(b)(2)(B) are *minimum* requirements.

In confirming a plan over the objection of a class, it is appropriate to identify the competing parties and to consider their relative positions in the case. The only claims other than MONY's that are legitimately impaired in this case are the Class D claims, composed of unsecured trade and insider claims. According to the Debtor's plan, this class is inferior to MONY's C–2 claim.

Class D represents approximately 2% of the total creditor claims in this case. For all practical purposes, MONY represents the balance. The claims of Classes C–2 and D are substantially similar. Application of the "new value" exception to absolute priority would result in confirmation of a plan for the benefit of 2% of the claims and, at best, the speculative interests of proposed investors.[11] The Court stated in *Mill Place Limited Partnership* that:

> In a two-party dispute, the new owner alternative to full payment, provided for

---

11. The Debtor argues that "[t]he partners are essentially buying the future risk of return, postponed in this case for what will probably be more than 10 years...." MONY argues that what the partners are really purchasing is present value in the form of going concern

value, payment for which belongs to MONY under its blanket security interest. Rational investors purchase present value, although realization might be delayed and be subject to risk. It is difficult to see how the proposed investment could constitute anything other than the

in § 1129(b)(2)(B)(ii), would be insufficient to satisfy the fair and equitable test, since the only beneficiaries of its application would be post-confirmation third party interests of new investors. The concept of cramdown is premised upon the equity of balancing the rights of disagreeing classes of creditors against one another. The concept has never involved the compromise or modification of creditors' rights for the post-confirmation benefit of new investors. *Mill Place*, 94 B.R. at 143. Application of the exception to absolute priority in this case, would fulfill the desire of Class D claimants for some small payment, in disregard of the rights of MONY, which holds approximately 97% of all substantially similar claims of the two classes.[12]

Specifically, the cramdown would be made, in part, for the purpose of providing Class D with a total payment of approximately $6,600, to be shared *pro rata* among its members in full satisfaction of the allowed amounts of their claims, which total approximately $453,000.[13] The only other apparent purpose for the cramdown would be to provide the proposed investors with a captive and cheap source of financing for a speculative venture.[14] The equities of such a "balancing", through the use of an exception to absolute priority, are not readily discernable; nor can any be uncovered after considerable digging.

*In summary on MONY's right to relief from stay.*

■ MONY is entitled to relief from stay under 11 U.S.C. § 362(d)(2) because the Debtor has no equity in the Lumber Exchange property, and the Debtor has not shown that there exists a reasonable possibility of a successful reorganization within a reasonable time. The Debtor's proposed plan is not confirmable over MONY's objection, and the Debtor has not shown that it is willing or able to propose a plan that could be confirmable over MONY's objection.

The Debtor is not entitled to separately classify MONY's unsecured claim, and without separate classification, Lumber Exchange cannot meet the requirements of 11 U.S.C. § 1129(a)(10). Furthermore, § 1129(b)(2)(B) would prevent confirmation of the Debtors' plan over the objection of MONY. The "new value" exception to the absolute priority rule, applied to individual dissenting creditors of an accepting class under the *Bankruptcy Act*, is not an exception to the absolute priority rights of a rejecting class, protected by § 1129(b)(2)(B) of the *Bankruptcy Code*. Even if the exception remained viable under the *Code*, however, the proposed plan could not be found fair and equitable to the rejecting class because the only beneficiaries of confirmation would be minority holders of a group of substantially similar claims and the proposed investors.

*Should The Case Be Dismissed Under 11 U.S.C. § 1112(b)(2) For Inability To Effectuate a Plan?*

■ 11 U.S.C. § 1112(b)(2) provides that, in the best interest of creditors, a court can

---

purchase of a present interest for present value. If so, the interest purchased would be an estate interest for which the Debtor would be required to account, either to its secured or unsecured creditors. Otherwise, the investors would simply be paying themselves.

12. Assuming that the Debtors valuation is correct, MONY's unsecured claim is approximately $13,000,000. The Class D unsecured claims total $453,000, or just over 3% of all unsecured claims.

13. The plan provides for a $200,000 fund to be shared pro rata among the Classes C–2 and D claims. The Class D share would be 3.3% of the fund, based on the Debtor's valuation of MONY's unsecured claim.

14. Of course, the Debtor argues that the new contributions proposed by the plan are both substantial and necessary to success of the plan. Such contributions always are, simply by design of the plan. Clearly, if the "new value" exception is available to cramdown confirmation on a rejecting unsecured class under the *Code*, and if a showing of "substantial" and "necessary" is all that is required to successfully invoke the cramdown, then the entire concept of absolute priority will have moved from protecting *all* creditors under the *Bankruptcy Act*, to protecting *none* under the *Code*. The exception will have overwhelmed and consumed the rule.

dismiss a case if a debtor is unable to effectuate a plan. Presumably, "inability" means inability to effectuate a confirmable plan. It is unlikely that the Debtor could effectuate a confirmable plan over the objection of MONY in this case. Certainly, no such plan appears on the horizon. The remaining question is whether it would be in the best interests of creditors to dismiss the case.

The unsecured creditors' committee submitted its own model plan, which it claims could be confirmed over MONY's objection. However, the plan is not confirmable because it provides for more favorable treatment of some claims over others in the same class, in violation of 11 U.S.C. § 1123(a)(4).[15] Furthermore, the plan is not confirmable because it would not be fair and equitable to the rejecting class. The sole beneficiaries of confirmation would be approximately 3% of the rejecting class that would have voted against the majority of the class.

A plan, confirmable over the objection of MONY, is simply not a realistic possibility in this case. Even if outside investors could be found, a plan that would not satisfy MONY's claims in full would not be confirmable over MONY's objection. The only beneficiaries in the cramdown of such a plan would be the 3% minority members of a group of substantially similar claims, 97% of which are held by MONY, and the new investors. Cramdown would not be fair and equitable under 11 U.S.C. § 1129(b)(2)(B).

That should not be surprising. This is substantially a single liability case. Accordingly, in the best interest of creditors, the case should be dismissed.

## IV.

### DISPOSITION

Based on the foregoing,

IT IS HEREBY ORDERED: This case is dismissed.

**15.** The committee's plan places the equity interests of the reorganized Debtor in the unsecured creditors, who are all members of the same class. All unsecured creditors, except Mony, are designated general partners of the reorganized Debtor. Mony is designated as the limited partner.